Amy VELEZ, Plaintiff–Appellant,

v.

Harold O. LEVY, Chancellor of the City School District of the City of New York, individually and in his official capacity, Jacob Goldman, individually and in his official capacity as a member of New York City Community School District # 1, Nancy Ortiz, individually and in her official capacity as a member of New York City Community School District Board # 1, Joyce Early, individually and in her official capacity as a member of New York City Community School District # 1, Thomas Hyland, individually and in his official capacity as Deputy Director of the Chancellor's Office of Special Investigations, Anthony De-Leo, individually and in his official capacity as Confidential Investigator in the Chancellor's Office of Special Investigations, Robert Colon, individually and in his official capacity as an Investigator in the Chancellor's Office of Special Investigations, Defendants–Appellees.

No. 03–7875.

United States Court of Appeals, Second Circuit.

Argued: April 12, 2004.
Decided: March 11, 2005.

James I. Meyerson, New York, NY, for Plaintiff–Appellant.

Stacy Laine Francolla, Assistant Corporation Counsel, for Michael A. Cardozo, Corporation Counsel of the City of New York (Francis F. Caputo, of counsel), New York, NY, for Defendants–Appellants.

Before: OAKES, WINTER, and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge.

We are faced today with the question of whether plaintiff, an elected New York City community school board member, may properly state a claim under the United States Constitution for injuries suffered in connection with her forced removal from office based on allegedly trumped-up charges of criminal behavior. Plaintiff-appellant Amy Velez, a member of Community School District Board # 1, has filed a suit pursuant to 42 U.S.C. § 1983 asserting constitutional and state law causes of action against seven defendants. First, she alleges that three fellow board members—defendants-appellees Jacob Goldman, Nancy Ortiz, and Joyce Early—conspired to fabricate, and to disseminate publicly, accusations that she had sprinkled a powdery substance in front of the office door of another school official. These defendants, Velez asserts, did this out of political animus and in an effort to cause her removal. Second, she contends that three individuals in the Chancellor's Office of Special Investigations—defendants-appellees Deputy Director Thomas Hyland, Confidential Investigator Anthony DeLeo, and Investigator Robert Colon—conducted an "irrational" and "illogical" investigation that resulted in a politically motivated report recommending Velez's removal. Third, she claims that the then-Chancellor of the City School District of the City of New York, Harold O. Levy, arbitrarily and capriciously ordered her

removal in punishment for her political positions.

On the basis of these allegations, Velez proffers several potential constitutional causes of action. She asserts: (1) that her removal constituted the denial of a property right in violation of the procedural requirements of the due process clause of the Fourteenth Amendment; (2) that her removal and the attendant stigma also deprived her of liberty without due process of law; (3) that the actions of the various defendants constituted violations of substantive due process; (4) that her removal was in retaliation for her stated political views and consequently in violation of the First Amendment; and (5) that her removal constituted an unlawful "seizure" under the Fourth Amendment. The district court, finding no colorable constitutional claim and declining to exercise supplemental jurisdiction over Velez's various state law claims, dismissed her complaint pursuant to Fed.R.Civ.P. 12(b)(6). *Velez v. Levy*, 274 F.Supp.2d 444 (S.D.N.Y.2003).

While we agree with the lower court that Velez lacks a constitutional property interest, and that her allegations are insufficient to make out a Fourth Amendment violation or a substantive due process violation, we conclude that her First Amendment and procedural due process liberty interest claims are viable, though not against all of the defendants. We further find that qualified immunity cannot, at this stage, bar these claims. We therefore affirm in part and vacate in part the judgment of the district court and remand the case for further proceedings.

## I. BACKGROUND

In reviewing a dismissal pursuant to Fed.R.Civ.P. 12(b)(6), we "accept[ ] all allegations in the complaint as true and draw[ ] all inferences in favor of the plaintiff." *ICOM Holding, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 221 (2d Cir.2001). Our undertaking here is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). With this in mind, we set forth the facts alleged that are relevant to the legal disputes in this case.

### A. The structure of the community school board

Amy Velez, a resident of the Lower East Side of Manhattan, was an elected member and treasurer of New York City Community School District Board # 1 ("Board # 1").[1] She was elected to a three-year term in May of 1999, and the state legislature later extended her term by one year.[2] Pursuant to Article 52–A of the New York Education Law, the City School District of the City of New York ("the District") is divided into 32 community school districts, each of which is governed by a community school district board. *See Warden v. Pataki*, 35 F.Supp.2d 354, 358 (S.D.N.Y.1999); N.Y. Educ. Law § 2590–b (McKinney 2001). These boards, including Board # 1, are composed of nine members. *See id.* § 2590–c. A seven-member city board— with one member appointed by each of the five borough presidents and the remaining

---

1. The relevant statutes governing the structure of the New York City school system were amended subsequent to the events in this case. Among other things, community boards have been replaced by community education "councils." Here, we relate the law as it was at the time these events occurred.

2. Velez's term spanned four years, because § 2590–c was amended in 2002 such that "the term of members otherwise due to expire on June thirtieth, two thousand two [was] extended until June thirtieth, two thousand three." Velez was one of these members.

two by the mayor—oversees and administers the community boards. *See id.* § 2590–b. The city board appoints the Chancellor, who serves for a fixed term that cannot exceed by more than one year the term of the city board which appointed him. *See id.* § 2590–h. The duties, powers, and relationships of these various entities are all fixed by statute and are described in detail in Article 52–A of the New York Education Law. The chief responsibility of the community board is to "establish educational policies and objectives, not inconsistent with the provisions of this article and the policies established by the city board, with respect to all" nursery, elementary, and middle school students within its geographical purview. N.Y. Educ. Law § 2590–e. The community boards have "no executive or administrative powers or functions," but they fulfill a number of advocacy and advisory roles, including, *inter alia*, "prepar[ing] a school district report card," "promot[ing] achievement of educational standards and objectives," "[a]pprov[ing] zoning lines," and "[p]rovid[ing] input... to the chancellor and the city board on matters of concern to the district." *Id.*

Although community board members are publicly elected officials, the Chancellor has unilateral statutory authority to suspend or remove them under certain circumstances. Specifically, N.Y. Educ. Law § 2590–*l*(1)(a) provides that the Chancellor may remove a community board member if he or she "fails to comply with any applicable provisions of law, bylaws, rules or regulations, standards, directives and agreements." Ordinarily, the Chancellor is required to provide an "opportunity for conciliation" prior to removal, but he or she is empowered to remove without conciliation any board member who has engaged in conduct that is "criminal in nature," or constitutes an immediate threat to student or staff "safety or welfare," or is "contrary to the best interest of the city school district." *Id.* § 2590–*l*(1)(b). Within fifteen days of removal, the board member may file an appeal with the city appeals board. *Id.* § 2590–*l*(2).

## B. The events leading to plaintiff's removal

Velez served on Board #1 alongside board members defendants Early, Goldman, and Ortiz. According to her, the three defendants were part of a four-person minority on the board that opposed Velez's majority voting bloc on several key issues. Among these were (1) the retention of Helen Santiago as the Superintendent of District #1, and (2) admission criteria for a new K–12 school known as the New Explorations in Science and Technology (NEST) school. Additionally, Velez had earlier opposed the vacancy-filling appointment of Ortiz to Board #1. The board's subsequent failure to reach a consensus on Ortiz's nomination led the Chancellor to "step in" and appoint Ortiz over Velez's objections. As a general matter, both sides agree that the plaintiff frequently engaged in political conflict with the defendant board members and Chancellor Levy.

A community board meeting held at P.S. #137 on January 23, 2002, exemplified that conflict. During that session, the board considered various aspects of Chancellor Levy's diversity policy, including the selection criteria for the NEST school. Velez clashed with Ortiz, Goldman, and Early, all three of whom opposed her alternative diversity proposal. But it was a dispute over what happened after the meeting that ultimately led to Velez's removal and subsequent reinstatement. According to defendant Ortiz, Velez left the meeting and proceeded to the office of Acting Superintendent Santiago, which was located inside the school. There, on

Ortiz's account, she sprinkled a suspicious, pink, powder-like substance in front of the office door and also dropped a plastic bag containing additional powder.[3] Velez vehemently denies having done this, on that or any other occasion.

The following day, January 24, the three board member defendants wrote a letter to Levy accusing Velez of the conduct Ortiz allegedly had witnessed. The letter characterized Velez's actions as harassment and criminal conduct, and concluded with a request that Levy remove her from the board. The allegations also found their way to the New York *Daily News*, which published an article on January 25 recounting the alleged sprinkling of "foul smelling" and "voodoo" powder by Velez. That same day, the substance of the *Daily News* report was repeated on various radio and television programs. In her complaint, Velez asserts that the defendants provided the information for all of these news accounts, and did so despite the fact that they knew the charges were utterly false.

## C. The investigation and removal

On January 28, five days after the alleged incident, an investigation was begun

by the Chancellor's Office of Special Investigations and conducted by defendants Thomas Hyland, Anthony DeLeo, and Robert Colon. These investigators interviewed sixteen witnesses—including all nine board members, Acting Superintendent Santiago, Santiago's assistant, a custodian and security guard at P.S. # 137, and two parents-and acquired a sample of the pink powder from defendant Goldman.[4] Goldman told them that he had received the sample from Ortiz, who allegedly retrieved it from its location in front of the Superintendent's office door after Velez had ostensibly placed it there.[5] Upon completing the interviews, the Office of Special Investigations submitted a report to the Chancellor dated February 11, 2002. The report concluded that "the allegation that Amy Velez, a member of Community School Board # 1, placed a suspicious powder in front of [the Acting Superintendent's] door on January 23, 2003 is substantiated with corroboration from Nancy Ortiz." [6]

A few days after receiving the report, Levy decided to exercise his authority under N.Y. Educ. Law § 2590-$l$(1) and (2), and, on March 15, 2002, he removed the

3. The suggestion, by Ortiz and others, was that this was some sort of "voodoo" powder.

4. The Office of Special Investigations ultimately determined that the powder sample was neither anthrax nor any other biological substance.

5. For her part, Superintendent Santiago told the investigators that she had found a small plastic bag filled with pink powder in front of her door the morning after a January 16 community school board meeting. She further explained that the District Office had received packages sent by mail containing a rotten chicken and feces. Velez, in her conversations with the investigation team, denied that she had at any time placed any powder in front of Santiago's door, and disclaimed any knowledge of the mailings.

6. The Board of Education appeals panel that reviewed the investigation and subsequent removal characterized the report as stating that "Ms. Ortiz was telling the truth and Ms. Velez lying about what happened on January 23." The investigator's decision to credit Ortiz's testimony, the Board found, was based largely on Ortiz's position as a corrections officer and her asserted willingness to sign an affidavit—which she never did. No reason was given for discrediting Velez, other than Ortiz's contradiction of Velez's account. According to plaintiff, no other witness testified that they had seen the plaintiff sprinkle or otherwise place powder in front of the superintendent's door.

plaintiff from her board position. In his letter to that effect addressed to Velez, he noted that the "Office of Special Investigation . . . has issued a report substantiating an allegation that on January 23, 2002, you placed 'voodoo' powder in front of the door of the superintendent of Community School District 1." He continued: "I conclude that your action . . . was, at a minimum, an attempt on your part to harass, frighten, and/or intimidate the superintendent and possibly others. Since the events of September 11, it should be obvious to you that depositing an unknown foreign substance in front of an office will cause disruption and anxiety . . . ." And he concluded: "I find that your actions may be criminal in nature and constitute inappropriate behavior for a school board member." Having found that the alleged conduct was "criminal," Levy determined that no conciliation was required and he removed Velez from the board "effective immediately."

## D. Reinstatement

On March 27, 2002, the plaintiff appealed Levy's decision to the Board of Education of the City School District of the City of New York, seeking both a stay of her removal and a reinstatement to her board position. A three-member panel of the Board of Education issued a stay, and ultimately reversed "in all respects" the Chancellor's March 15 removal order. In June, 2002, the full Board of Education unanimously ratified and adopted the panel's decision, including all of its factual and legal findings, which were, among other things, that:

> Such as it is . . . the record is replete with indications that the investigation upon which the Chancellor relied was incomplete in its conduct and illogical in its conclusions. . . .

[T]he most cursory scrutiny shows that the OSI Report is grossly flawed and could not rationally be relied upon by anyone to support the finding contained in the Chancellor's order. . . .

The admission that conversations with political figures played a role in the process, the indications throughout that the official "record" contained yawning gaps, the undue reliance on Ms. Ortiz's position as proof of her credibility and the lack of evenhandedness in weighing the testimony of the two principal witnesses all compel the conclusion that the Chancellor's order was arbitrary and capricious. . . .

The Chancellor's authority to remove Ms. Velez, were she properly found to have committed the act alleged, rests on the finding that the act was criminal in nature. But that finding too is irrational.

Based on the Board of Education's decision, Velez was reinstated to her position effective June 15, 2002.

## E. Proceedings below

On August 12, 2002, Velez filed a complaint in the United States District Court for the Southern District of New York, alleging various federal and state causes of action. The gravamen of her claims was that the defendant board members invented the pink powder allegation, that the investigators confirmed it, and that the Chancellor accepted it as fact and removed Velez, all in an effort "to silence her and to serve [their] own personal interests and ulterior motives." Or, as the district court put it, the investigation and removal were allegedly conducted in pursuit of the defendants' "personal and political ends." 274 F.Supp.2d at 449. As a result of the defendants' actions, plaintiff alleged that she suffered embarrassment, mental anguish, humiliation, fear and other emotional distress. What is more, she claimed

that she was stigmatized in both her professional and personal life.

As noted above, Velez's specific constitutional claims included: (1) deprivation of liberty and property in violation of the Fourteenth Amendment's procedural and substantive due process requirements (Counts 1, 4, 6, 9, and 14); (2) unlawful retaliation for political positions and expression, in violation of the First and Fourteenth Amendments (Counts 5 and 14); and (3) unlawful "seizure" of her elected office in violation of the Fourth and Fourteenth Amendments (Count 13).[7] Her causes of action under state law included: (1) violations of the New York State Constitution (Count 2); (2) negligence (Counts 3 and 8); (3) deprivation of her "right to conciliation" under the New York State Constitution and New York State law (Count 7); (4) defamation (Count 10); (5) malicious abuse of civil process (Count 11); and (6) intentional infliction of emotional distress (Count 12).

In a lengthy opinion, the district court (Koeltl, *J.*) considered the constitutional claims in turn and determined that the plaintiff had failed in each instance to state a colorable cause of action. In the alternative, the court concluded that all of the defendants were entitled to qualified immunity. Finally, the court declined to exercise supplemental jurisdiction over the state law claims. The case was dismissed—the state law claims without prejudice—and plaintiff appeals that dismissal.

## II. DISCUSSION

On appeal, the plaintiff challenges both of the district court's broad findings: (1) that she has failed to state a federal constitutional claim upon which relief may be granted; and (2) that defendants are entitled to qualified immunity. In assessing her challenge, we will consider her constitutional claims seriatim, and then take up the issue of qualified immunity.

### A. Standard of review

■ We review dismissals pursuant to Rule 12(b)(6) *de novo,* and we will only affirm if we are satisfied that the plaintiff can prove no set of facts that would entitle her to relief on her claims. *See Wynder v. McMahon,* 360 F.3d 73, 78 n. 8 (2d Cir. 2004) (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In the course of our analysis, as we have stated earlier in this opinion, we will accept all of the plaintiff's allegations as true and focus on their legal sufficiency. *Goldman,* 754 F.2d at 1067.

■ To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) "that some person has deprived him of a federal right," and (2) "that the person who has deprived him of that right acted under color of state … law." *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (citing *Monroe v. Pape,* 365 U.S. 167, 171, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)). There is no dispute here that Velez's dismissal by Levy was state action. The critical substantive inquiry, then, is whether the plaintiff has alleged facts that would, if believed, show that she was deprived of the constitutional rights identified in her complaint.

■ With respect to qualified immunity, we also review the district court's rulings *de novo.* *See Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). In so doing, we apply the two-step test set forth in *Saucier v.*

---

7. Velez's complaint initially also stated an Equal Protection claim, but she abandoned any separate claim to that effect below and does not raise it on appeal. *See* 274 F.Supp.2d at 447 n. 1.

*Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). First, in our analysis of the district court's Rule 12(b)(6) dismissal, we ordinarily answer the question of whether " 'the officer's conduct violated a constitutional right[.] This must be the initial inquiry.' " *Ehrlich v. Town of Glastonbury,* 348 F.3d 48, 55 (2d Cir.2003) (quoting *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151). Then, if we conclude that a right has been violated, " 'the next, sequential step is to ask whether the right was clearly established.' " *Id.* (quoting *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151). And in applying this test, we once again review the facts in the light most favorable to the plaintiff and draw all permissible inferences in the plaintiff's favor. *See, e.g., McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir.2004). With these standards of review in mind, we turn to the merits.

### B. *Plaintiff's property interest claim*

Velez asserts that she was deprived, without due process of law, of a constitutionally cognizable property interest in her elected community school board position. The district court concluded that she possessed no such property interest, and therefore cannot state a claim to this effect. We agree, although for different reasons than those given by the district court.[8]

■ In order to establish a due process violation of this sort, plaintiff must show that state action deprived her of a property interest protected by the Fourteenth Amendment. *See White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1062 (2d Cir.1993). While property interests are constitutionally protected, they are not generally constitutionally *established;* rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Thus, only where a plaintiff can demonstrate that state law confers "a legitimate claim of entitlement" to a particular position will a property interest in that position arise. *Id.*

■ Velez asserts a property interest in her community school board position based on the state legislation that created it. On her view, she enjoyed a "real, non abstract objective expectation that she would continue to function in her elected position for her full term ... absent some established cause" and appropriate process, and submits that this amounts to a legitimate claim of entitlement.[9] Her assertions are supported by the statutory scheme creating the community school board system. Under New York's statutory framework, elected school board officials are entitled to serve during their elected terms, and can only be removed by the Chancellor for cause. N.Y. Educ. Law § 2590–*l*(1). And New York courts enforced these statutory restrictions on removal, thereby demonstrating that the limits on the Chancellor's removal powers were not simply precatory. *See, e.g., Maldonado v. Crew,* 236

---

8. The district court read Velez's complaint as alleging a procedural due process, property interest claim against all seven defendants. Neither party disputes this characterization of the pleadings; we also therefore·treat the various causes of action as collectively asserting such a claim against all defendants.

9. Specifically, she argues that she possessed a "form of tenure" similar to that enjoyed by the plaintiff state civil service employees in *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

A.D.2d 314, 653 N.Y.S.2d 596 (N.Y.App. Div.1997) (affirming order enjoining the Chancellor from suspending community board members without cause). It might seem, then, that Velez's allegations would be adequate to support a property interest claim. *See DeMichele v. Greenburgh Cent. School Dist.*, 167 F.3d 784, 789 (2d Cir. 1999) ("It is well settled that [the plaintiff], as a public employee who can be discharged only for cause, had a constitutionally protected property interest.").

Nevertheless, in light of the Supreme Court's pronouncements in *Taylor and Marshall v. Beckham*, 178 U.S. 548, 20 S.Ct. 890, 44 L.Ed. 1187 (1900) and *Snowden v. Hughes*, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), we conclude that Velez lacks a constitutionally cognizable property interest in her elected office. In *Taylor*, the governor of Kentucky claimed to have been deprived of property—namely, his political position—without due process of law, since, he averred, the recount election ousting him from office was marred by voter fraud. The Court rejected his claim in short order:

> The decisions are numerous to the effect that *public offices are mere agencies or trusts, and not property as such . . . . [G]enerally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right.*

*Id.* at 577, 20 S.Ct. 890 (emphasis added). The Court therefore concluded that the official had been "denied no right secured by the 14th Amendment." *Id.* at 578, 20 S.Ct. 890.

In *Snowden*, the Court, reaffirming *Taylor*, again asserted that elected offices cannot constitute "property" within the meaning of the Fourteenth Amendment:

> More than forty years ago this Court determined that an unlawful denial by state action of a right to state political

office is not a denial of a right of property . . . secured by the due process clause. *Taylor and Marshall v. Beckham*, 178 U.S. 548, 20 S.Ct. 1009 [44 L.Ed. 1187]. Only once since has this Court had occasion to consider the question and it then reaffirmed that conclusion, *Cave v. State of Missouri ex rel. Newell*, 246 U.S. 650, 38 S.Ct. 334, 62 L.Ed. 921, *as we reaffirm it now.*

*Snowden*, 321 U.S. at 7, 64 S.Ct. 397 (emphasis added).

The Court's pronouncements in *Taylor* and *Snowden* have since been echoed in numerous decisions. *See, e.g., Burks v. Perk*, 470 F.2d 163, 165 (6th Cir.1972) (per curiam) ("Public office is not property within the meaning of the Fourteenth Amendment.") (citing *Taylor*); *Rabkin v. Dean*, 856 F.Supp. 543, 549 (N.D.Cal.1994) (asserting that elected officials are not "employees" in the traditional sense, and hence do not hold a property interest in their positions); *Sweeney v. Tucker*, 473 Pa. 493, 524, 375 A.2d 698 (1977) (rejecting legislator's property interest claim, and noting that, because an elected official "holds office for the benefit of his constituents and cannot justifiably rely on a private need or expectation in holding office," an elected office "is a public trust, not the private domain of the officeholder."). *See also Guzman Flores v. College of Optometrists*, 106 F.Supp.2d 212, 214 (D.Puerto Rico 2000) (relying on *Taylor* and *Snowden* to dismiss a property interest claim put forth by a candidate for public office, and stating, "the Supreme Court squarely addressed the issue now before the Court and held that there was no due process right to seek election to public office. . . . Therefore, Guzman does not have a valid due process claim in the instant case.").

We are mindful that, since *Taylor* and *Snowden* were decided, the Court has adopted a more expansive approach to

identifying "property" within the meaning of the 14th Amendment. *See, e.g., Roth,* 408 U.S. at 577, 92 S.Ct. 2701. But while intervening cases may cast a shadow over *Taylor* and *Snowden,* "it is [the Supreme] Court's prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan,* 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). Accordingly, we follow the Court's pronouncements on this issue, and are bound to conclude that Velez lacks a constitutionally cognizable property interest in her employment as an elected official. And finding, as the district court did, that the plaintiff lacks a constitutionally protected property interest in her elected position sufficient to support a due process claim, we affirm the district court's dismissal of this cause of action.[10]

## C. Plaintiff's liberty interest claim

Adverting again to the Due Process Clause, the plaintiff asserts that the stigma she suffered from public accusations of criminal behavior, combined with the tangible loss of her position as a community board member, amounted to a constitutionally cognizable deprivation of liberty without sufficient process.[11] To state a valid claim for such an injury, Velez's complaint must assert (1) that she possessed a cognizable liberty interest, and (2) that the defendants deprived her of that same liberty without providing process adequate to

justify their actions. *See DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003); *Vega v. Miller,* 273 F.3d 460, 470 (2d Cir. 2001).

### i. Liberty Interest

■ A § 1983 liberty interest claim of this sort—commonly referred to as a "stigma plus" claim, *see, e.g., Sadallah v. City of Utica,* 383 F.3d 34, 38 (2d Cir.2004)— requires a plaintiff to allege (1) the utterance of a statement about her that is injurious to her reputation, "that is capable of being proved false, and that he or she claims is false," and (2) "some tangible and material state-imposed burden ... in addition to the stigmatizing statement." *Doe v. Dep't of Pub. Safety ex rel. Lee,* 271 F.3d 38, 47 (2d Cir.2001), *rev'd on other grounds, Connecticut Dept. of Public Safety v. Doe,* 538 U.S. 1, 123 S.Ct. 1160, 155 L.Ed.2d 98 (2003). The defamatory statement must be sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest. *See, e.g., Donato v. Plainview–Old Bethpage Cent. School Dist.,* 96 F.3d 623, 631–32 (2d Cir.1996). Similarly, because "[a] free-standing defamatory statement ... is not a constitutional deprivation," but is instead "properly viewed as a state tort of defamation," *id.,* the "plus" imposed by the defendant must be a spe-

**10.** Velez also alleges a violation of the Fourth Amendment, on the grounds that her board position and her identity as a community school board member were "seized" by state actors. The district court found this claim to be without merit, and we agree. While we concur with the plaintiff that the Fourth Amendment does not require plaintiffs to assert a property interest, *see, e.g. Katz v. United States,* 389 U.S. 347, 352–53, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), we do not believe that defendants' alleged actions constitute a "seizure" within the meaning of the Fourth Amendment. The privacy interests vindicated by that provision are not at stake here. *Cf.*

*Caldarola v. County of Westchester,* 343 F.3d 570, 575 (2d Cir.2003) (discussing the extent to which privacy interests must be implicated in order to state a Fourth Amendment claim). The district court's dismissal of this claim is therefore affirmed.

**11.** As with the property interest claim, the district court read the plaintiff's complaint as alleging a procedural due process, stigma-plus liberty interest claim against all seven defendants. And in the absence of any objection, we also so read it.

cific and adverse action clearly restricting the plaintiff's liberty—for example, the loss of employment, *see, e.g., Siegert v. Gilley*, 500 U.S. 226, 233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (noting that "[d]efamation, by itself, is a tort actionable under the laws of most States, but not a constitutional deprivation," and that absent a "plus," stigmatizing statements do not give rise to constitutional claims), or the "termination or alteration of some other legal right or status." *Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir.1989).

In a typical "stigma-plus" case, the stigmatizing statement originates from the same state actor who imposes the "plus," such as when a government employer defames an employee in the course of terminating that employee. *See, e.g., Donato*, 96 F.3d at 630; *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). But Velez complains of a less single-sourced injury. She alleges that the board member defendants, by making false charges of harassment and terrorism against Velez, created a significant public "stigma." (Indeed, Velez asserts that the board member defendants caused their fabricated claims to appear in local newspapers, as well as in assorted radio and television programs.) It is undisputed, however, that the board members did not themselves directly impose the "plus" asserted by Velez—namely, her removal from office, which only Levy had the power to bring about. Velez's "stigma-plus" claim, therefore, involves a "stigma" that did not originate from the same party who inflicted the "plus." Given our clear holdings that "stigma" without "plus" is insufficient to support a "stigma-plus" claim, and vice versa, *see, e.g., Donato*, 96 F.3d at 630, it might seem to follow that Velez's complaint is fatally flawed.

That is not, however, required by the precedents on this issue. Though we have never directly addressed the question, other circuits have approved of "stigma-plus" claims in which the "plus" was imposed separately from any explicit stigmatizing statement. For example, in *McGhee v. Draper*, 639 F.2d 639 (10th Cir.1981), the Tenth Circuit found a liberty deprivation where a number of parents and students made stigmatizing statements at school board meetings and asked for a specific "plus," which the defendant school board eventually imposed by terminating the plaintiff. *See id.* at 643; *McGhee v. Draper*, 564 F.2d 902, 906–07 (10th Cir.1977) (earlier opinion giving factual background). In so doing, the Tenth Circuit noted that "[t]ypically, when one's liberty interest is allegedly infringed upon by a discharge from employment, the termination or non-renewal will either explicitly state the stigmatizing factors *or implicitly ratify some other stigmatizing allegations*. Thus, the discharge will either cause *or contribute to* the alleged defamation. In either case, the defamed's liberty 'to engage in any of the common occupations of life' is diminished, and the defamation has occurred 'in the course of the termination of employment.'" *McGhee*, 639 F.2d at 643 (emphasis added) (*quoting Roth*, 408 U.S. at 572, 92 S.Ct. 2701, *and Paul v. Davis*, 424 U.S. 693, 710, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). *See also Bishop v. Tice*, 622 F.2d 349, 352–54 (8th Cir.1980) (holding that the stigmatizing statements of two defendants, made at the direction of a third defendant, in conjunction with the imposition of a "plus"—the denial of administrative remedies—by the third defendant, stated a valid claim for deprivation of plaintiff's liberty interest); *Marrero v. City of Hialeah*, 625 F.2d 499, 519–20 (5th Cir.1980) (holding, where stigma and plus were imposed by the same actors, that "the defamatory communication need not cause the loss of the protected right, or more tangible interest, in order to satisfy the stigma-plus

requirement," because "it is sufficient that the defamation occur *in connection with, and be reasonably related to,* the alteration of the right or interest") (emphasis added). Thus, it would seem that, even where a "stigma" and "plus" are not imposed by the same actor, a stigma-plus claim may be valid if the "stigma" and "plus" were connected. *See id.* (concluding that plaintiff presented a valid § 1983 claim since "the fact that the public perceived the defamatory charges to be connected to the discharge was sufficient to give rise to a liberty interest"); *cf. Owen v. City of Independence, Missouri,* 445 U.S. 622, 626–29, 633 & n. 13, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (upholding stigma-plus claim against a municipality, where the stigmatizing statements were originally made in private by the official imposing the "plus" and were actually released to the public by another municipal actor who made additional stigmatizing statements; the Court did this on the basis that the accusations had "received extensive coverage in the press, and even if they did not in point of fact 'cause' petitioner's discharge, the defamatory and stigmatizing charges certainly 'occur[red] in the course of the termination of employment.'") (*quoting Paul,* 424 U.S. at 710, 96 S.Ct. 1155).

■ We now hold that perfect parity in the origin of both the "stigma" and the "plus" is not required to state the infringement of a "stigma-plus" liberty interest. And the absence of a stringent "source parity" requirement is hardly surprising, given our rules on *temporal* proximity. When government actors defame a person and—either previously or subsequently—deprive them of some tangible legal right or status, *see Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir.2002), a liberty interest may be implicated, even though the "stigma" and "plus" were not imposed at precisely the same time. *See, e.g., Ulrich v. City and County of San Francisco,* 308 F.3d 968, 983 (9th Cir. 2002) (holding that the temporal separation of stigma and plus does not bar a stigma-plus claim if the defamatory statements were, in substance, "so closely related to discharge from employment that the discharge itself may become stigmatizing in the public eye") (internal quotation marks omitted); *Patterson v. City of Utica,* 370 F.3d 322, 335 (2d Cir.2004) (noting that successful stigma-plus claims require rough temporal proximity between stigma and plus, but not actual contemporaneity).

■ It follows that in ascertaining whether a complaint alleges the deprivation of a stigma-plus liberty interest, we need only determine that both "stigma" and "plus" are claimed to be sufficiently proximate. This requirement will be satisfied where (1) the stigma and plus would, to a reasonable observer, appear connected—for example, due to their order of occurrence, *see Ulrich,* 308 F.3d at 983, or their origin, *see McGhee,* 639 F.2d at 643—and (2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so. There is no rigid requirement, therefore, that both the "stigma" and the "plus" must issue from the same government actor or at the same time.[12]

---

**12.** The existence of a *liberty interest,* based on stigma-plus (in cases in which the stigma and the plus have different origins) is a very different question from that of whether both the originator of the stigma and the imposer of the plus are liable to the plaintiff. And it is the case that, for any number of reasons (the absence of state action, the provision of adequate process, etc.), one or more defendants whose actions collectively *implicate* a liberty interest may not be *liable* for the deprivation of that liberty interest. But at this stage in our inquiry, we need only concern ourselves with whether the complaint avers to a valid liberty interest. We will deal later with the liability of the different parties involved.

The First Circuit's decision in *Hawkins v. Rhode Island Lottery Commission,* 238 F.3d 112 (1st Cir.2001), is not to the contrary. In *Hawkins,* the Rhode Island Lottery Commission removed the plaintiff from office "after a flurry of negative publicity in which his conduct in office was criticized, primarily by the state's governor, defendant Lincoln Almond," *id.* at 113. Almond, however, could not force plaintiff's termination; only the Lottery Commission had that authority. Accordingly Almond, in his public complaints, called on the Commission to remove the plaintiff. But the Commission, in its termination of the plaintiff, "uttered no defamatory statements," and instead *specifically denied* that its actions were an endorsement of Almond's stigmatizing claims. Significantly, the Commission issued a press release "a few days before [plaintiff's] termination" stating that a new Lottery Director should be selected not because plaintiff (the then-current Lottery Director) was dishonest and incompetent (as Almond had publicly and repeatedly claimed), but because the "controversy surrounding [the plaintiff]" was "diverting law makers' attention from more pressing state problems," and the selection of a new Lottery Director would end the controversy. *Id.* at 116 n. 8. To be sure, the First Circuit noted that "the party responsible for the alleged defamation was not the party responsible for the termination," but this was only one piece of evidence tending to show that there was no actual connection between the "stigma" and "plus." And this lack of connection was the fundamental reason no due process violation occurred; the court pointed, for example, to the fact that Almond "neither spoke for the Commission nor controlled its ac-

tions." *Id.* at 116 & n. 8. Little wonder, then, that the First Circuit held that the plaintiff had "failed to state a viable due process claim." *Id.* at 116.

 Velez, in contrast, asserts that not only did none of the defendants seek to separate the removal decision from the allegedly stigmatizing statements, but that the Chancellor's decision to exclude her from office was *expressly* based on her purportedly "criminal" and "inappropriate behavior." In other words, Velez alleges that the board members made, and sought to publicize in local news sources, highly stigmatizing statements that explicitly requested her removal by Chancellor Levy. She also asserts that Levy responded to the board members' charges by removing her from office on the basis of those charges. Thus, Velez's complaint claims that the board members imposed a "stigma" and asked for a "plus," and that the Chancellor, against the backdrop of, and based upon, the board members' statements, imposed the very same "plus" requested by the board members, thereby adopting the "stigma." Taking these allegations as true, we conclude that this combination of activities implicated Velez's "stigma-plus" liberty interest, and that Velez adequately asserts the deprivation of such an interest. We leave for later the question of who, if anyone, may be liable for the deprivation of that interest.[13]

### *ii. Adequate Process*

Defendants submit that Velez's stigma-plus claim should, nonetheless, be dismissed because Velez has been afforded adequate process in the form of a post-removal hearing. The district court, having found, as we have, that the plaintiff

---

13. *See McGhee,* 639 F.2d at 643 (validating "stigma-plus" claims, but only insofar as the "plus" alleged by the plaintiff "explicitly state[s] the stigmatizing factors or *implicitly ratif[ies] some other stigmatizing allegations* ") (emphasis added).

possessed a cognizable liberty interest, agreed with the defendants that the opportunity, which Velez received, to clear her name after the fact was all the process to which she was entitled.

In reaching this conclusion, the court relied on *Donato*, in which we remanded a stigma-plus claim and ordered a name-clearing inquiry. We there wrote: "A hearing must be held for the limited purpose of giving a discharged employee an opportunity to clear her name. A name-clearing hearing significantly reduces the risk that an employee will be dismissed with false stigmatizing charges placed in her personnel file." *See Donato*, 96 F.3d at 633. Pointing to that language, the district court in the instant case observed, "[t]he appeals process that the plaintiff took advantage of not only allowed the plaintiff to contest the findings of the investigative report, but also her removal from office, and as a result of this process, the plaintiff was restored to School Board # 1." 274 F.Supp.2d at 453. Since, the court reasoned, Velez concededly received this ex post process, she failed to allege a valid stigma-plus, procedural due process claim. *Id.*

The district court, when it so concluded, did not, however, have the benefit of our recent decision in *DiBlasio v. Novello*, 344 F.3d 292 (2d Cir.2003). In a context similar to the one before us, *DiBlasio* reconfirmed the long-standing and well settled proposition that an ex post, as opposed to a pre-removal, hearing is inadequate to satisfy the dictates of due process where the "government actor in question is a high-ranking [state] official with 'final authority over significant matters.'" *Id.* at 302 (quoting *Burtnieks v. City of New York*, 716 F.2d 982, 988 (2d Cir.1983)).

In *DiBlasio*, the commissioner of the New York Department of Health issued a press release indicating that he had sus-

pended the license of the plaintiff, a radiologist, based on a finding of incompetence and of "criminal[ ]" behavior. *Id.* at 295. The plaintiff sued the commissioner, asserting, among other things, a stigma-plus liberty violation. On a Rule 12(b)(6) motion, the district court dismissed the due process claim, citing *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir.1996). (*Hellenic American* amplified the Supreme Court's distinction between "(a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees," *id.*, and emphasized that, because the state is in no position to provide adequate pre-deprivation process in the latter case, post-deprivation review is adequate. *Id.* But in so holding, it also indicated that where established state procedures are involved, pre-removal hearings will normally be required. *Id.*) On its reading of *Hellenic American*, the district court in *DiBlasio* concluded that the commissioner's statements required only a post-deprivation proceeding.

On appeal we held that the district court had erred in this conclusion. We started from the long accepted premise that due process dictates that persons ordinarily deserve "some kind of hearing" *prior* to the deprivation of a liberty interest, 344 F.3d at 302, and that it is only where the state is effectively "unable to anticipate and prevent a random deprivation of a liberty interest, [that] post deprivation remedies might satisfy due process." *Zinermon v. Burch*, 494 U.S. 113, 132, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). For this reason, we held that post-deprivation remedies do not suffice where the "government actor in question is a high ranking official with 'final authority over significant matters'" *DiBlasio*, 344 F.3d at 302 (quoting *Burtnieks v. City of New York*, 716

F.2d 982, 988 (2d Cir.1983)); *see also Dwyer v. Regan*, 777 F.2d 825, 832 (2d Cir.1985). Since the "state acts through its high-level officials," the decisions of these officials more closely resemble established state procedures than the haphazard acts of individual state actors that the *Hellenic American* exception was designed to cover. *DiBlasio*, 344 F.3d at 303. The health commissioner's actions in *DiBlasio* could therefore not be deemed to be random or unauthorized, and pre-removal process was required. On that basis, plaintiff's liberty interest claim was reinstated. *Id.*[14]

Here, with respect to Chancellor Levy, our reasoning in *DiBlasio* applies with equal force. Levy is precisely the sort of "high ranking" official identified by this line of cases. Just as in *DiBlasio*, where the commissioner "had the authority to suspend summarily DiBlasio's license, and had the duty as commissioner to ensure that the department followed the prescribed procedures governing summary suspensions," *id.* at 304, Levy had the authority to remove Velez, and the duty as Chancellor to follow the governing New York statutes and regulations. And, as in *DiBlasio*, "any abuse of that authority that rose to the level of a due process violation cannot be considered 'random and unauthorized.'" *Id.*[15] Accordingly, Velez was entitled to a pre-deprivation hearing before Levy executed the decision to remove her from the board.[16]

14. We had previously noted that the Supreme Court's "different treatment of the two situations rests on pragmatic considerations." *See Hellenic American*, 101 F.3d at 880 (citing *Hudson v. Palmer*, 468 U.S. 517, 532–33, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). When an arbitrary act by a state employee causes a deprivation, "it is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place." *Hudson*, 468 U.S. at 532, 104 S.Ct. 3194 (internal quotation marks omitted). That is not so, however, when a deprivation occurs because of an action taken by an ultimate decision-maker.

15. Similarly, "[t]he fact that some of [the commissioner's] statements were ... otherwise in violation of state law does not, under the circumstances here, render them 'unauthorized,' as that term is understood in the applicable case law." *DiBlasio*, 344 F.3d at 304.

16. *Donato*, which involved a school administrator who was allegedly defamed in connection with her termination, is not to the contrary. In *Donato*, once we determined that the plaintiff had properly asserted a deprivation of liberty, we directed the district court to ensure that the plaintiff received a fair post-deprivation hearing, 96 F.3d at 633. In the event that the school's charges against the plaintiff actually proved to be false, we also instructed the court to consider "the factual and legal merits of Donato's claim for damages." Thus, our focus in *Donato* was on finding a case-specific "[r]emedy" for the wrong alleged. *Id.* At the stage of the proceedings in which *Donato* reached us, a post-deprivation hearing was the only hearing we could require, since it was too late for a pre-termination hearing. And in ordering a post-termination hearing, we in no way suggested that post-termination process sufficed; rather, we explicitly ordered that, if such a hearing revealed that the defendant's allegedly stigmatizing charges were indeed false, the district court "should consider the factual and legal merits of Donato's claim for damages." *Id.* Significantly, damages could only be properly considered on the assumption that the post-termination procedures ordered were not sufficient, and, implicitly, that Donato had originally been entitled to a pre-deprivation hearing.

Similarly, we find no contradiction in *Locurto v. Safir*, 264 F.3d 154 (2d Cir.2001). For *Locurto* explicitly recognized that pre-deprivation process is typically required before a government employee is terminated, *see id.* at 171, and dealt only with the question of *who* (the employer or a neutral adjudicator) should administer pre-deprivation procedures, as opposed to *whether* pre-deprivation process was required, *see id.* at 174. Likewise, our recent decision in *Patterson v. City of Utica*, 370 F.3d 322 (2d Cir.2004), despite

■ It follows that the plaintiff's allegation that the Chancellor acted without providing an adequate *pre*-deprivation hearing states a valid claim under the Due Process Clause of the United States Constitution.[17] We hold otherwise, however, with respect to the plaintiff's procedural due process cause of action against the board members. To begin with, it seems to us likely that the board members' alleged acts—inventing a story of the plaintiff's criminal behavior in an effort to secure her removal from the board—fall within the "random and unauthorized" exception articulated in *Hellenic American.* More important, none of the board member defendants had the power to provide process to the plaintiff. They did not undertake or oversee the investigation, and they could order neither pre-removal review nor post-removal remedies. As a consequence they cannot be held legally accountable for the alleged process failure.

The same is true as to the investigators, Hyland, DeLeo, and Colon. Velez alleges that the investigators acted "in concert" with the Chancellor in effecting her removal from office. [JA116] But Velez concedes that the investigators had no legal authority to bring about her ouster, for only Levy was empowered to impose that "plus." Accordingly, Velez's complaint does not state a theory under which the investigators can be taken to have deprived Velez of her "stigma-plus" liberty interest. They are not alleged to have uttered the "stigma" at issue, and they could not have imposed the "plus" to which she avers. We therefore affirm the district court's dismissal of Velez's liberty interest claim against the investigators.

### D. Plaintiff's substantive due process claim

■ For a substantive due process claim to survive a Rule 12(b)(6) dismissal motion, it must allege governmental conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998); *see also Poe v. Leonard,* 282 F.3d 123, 139 (2d Cir.2002) (applying *Sacramento* ). We tend to speak of that which "shocks the conscience" largely in the context of excessive force claims, *see, e.g., Hemphill v. Schott,* 141 F.3d 412, 419 (2d Cir.1998). But it can apply to other areas of govern-

some troubling language, does not, in its holding, undermine *DiBlasio* or the long line of precedents on which *DiBlasio* rests. In *Patterson,* we concluded that even the *post*-termination proceedings afforded to the plaintiff were inadequate. *See id.* at 337 ("[T]he so-called hearing that took place [after plaintiff's termination] was insufficient to allow plaintiff to refute the charges against him and clear his name.... Thus, we hold as a matter of law the [post-removal] hearing was insufficient to satisfy the requirements of the Due Process Clause."). Because that fact alone sufficed to support a procedural due process violation claim, our holding did not—and could not—address the need for additional *pre*-removal process, especially in situations where the allegedly violative acts occurred at the hands of a high-ranking government official with final decision-making authority.

Finally, we need not consider the fact that "under certain emergency circumstances, a post-deprivation hearing is all that is required to satisfy due process." *DiBlasio,* 344 F.3d at 304. The defendants do not purport to have removed Velez because of emergency circumstances; instead, they claim that the pre-deprivation process provided—an investigation—was sufficient.

17. Since this case was dismissed on a Rule 12(b)(6) motion on the basis that no pre-deprivation process was due to Velez, we express no view as to whether Velez did, in fact, receive sufficient *pre*-deprivation process. The answer to that question depends on facts which may or may not be contested and is governed by the factors set forth in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

ment activity as well, *see, e.g., Natale v. Town of Ridgefield*, 170 F.3d 258, 262–63 (2d Cir.1999) (discussing the "shock the conscience" test in an administrative action case). " 'The measure of what is conscience-shocking is no calibrated yard stick.' " *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 252 (2d Cir.2001) (quoting *Sacramento*, 523 U.S. at 847, 118 S.Ct. 1708). Nevertheless, "malicious and sadistic" abuses of power by government officials, intended to "oppress or to cause injury" and designed for no legitimate government purpose, "unquestionably shock the conscience." *Id.* This is so because our constitutional notion of due process rests on the bedrock principle that we must protect the individual "against . . . the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Sacramento*, 523 U.S. at 845–46, 118 S.Ct. 1708 (internal quotation marks and citations omitted).

Here, the pleadings allege that the board member defendants, together with the Chancellor and the investigators, intentionally and maliciously fabricated and disseminated falsehoods in a common effort to deprive the plaintiff of her job—and of her opportunity to represent her constituents. It is further asserted that they did this for no reason other than to "oppress" her and to "cause her injury," and that their project had no legitimate purpose. If these purported facts are proven, the defendants' conduct might well be sufficiently "arbitrary" and "outrageous," in a constitutional sense, to make out a valid substantive due process claim. *See Natale*, 170 F.3d at 262.

 But the context that is relied upon to make the alleged actions by the defendants potentially shocking enough to sound in substantive due process, also en-

tails, under our cases, that no such cause of action can survive defendant's motion to dismiss. What is allegedly shocking about what the defendants' did is either their intent to violate plaintiff's fundamental First Amendment rights, or their motive to deprive her of liberty without procedural due process. In other words, what would serve to raise defendant's actions beyond the wrongful to the unconscionable and shocking are facts which, if proven, would constitute, in themselves, specific constitutional violations. And we have held that where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process. *See, e.g., Kia P. v. McIntyre*, 235 F.3d 749, 757–58 (2d Cir. 2000) (" '[W]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process.' ") (quoting *Conn v. Gabbert*, 526 U.S. 286, 293, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (internal quotes and citation omitted)). Because we believe that, as a matter of law, defendants' purported actions would not—but for the allegations of First Amendment violations, or (now abandoned [18]) Equal Protection Clause violations—be sufficiently shocking to state substantive due process claims, we conclude that plaintiff's substantive due process claim is either subsumed in her more particularized allegations, or must fail. Accordingly, we affirm the district court's dismissal of Velez's substantive due process claim against all the defendants.

### E. *Plaintiff's First Amendment Claim*

 Velez asserts that her removal from the community school board, and the

---

**18.** See note 7 *supra*.

defamation to which she was subjected, were carried out in retaliation for the political positions she took in opposition to Levy and the three board member defendants. This political retaliation, she submits, is a violation of her First Amendment rights. In articulating a First Amendment claim, Velez relies on a series of public employee cases, which hold, in substance, that a government employee's right to free speech is violated if "(1) [her] speech addressed a matter of public concern, (2)[s]he suffered an adverse employment action, and (3) a causal connection existed between the speech and the adverse employment action, so that it can be said that [her] speech was a motivating factor in the determination." *Feingold v. New York*, 366 F.3d 138, 160 (2d Cir.2004) (internal quotation marks omitted).[19] *See also Rankin v. McPherson*, 483 U.S. 378, 383–84, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1057–58 (2d Cir.1993).

The district court dismissed Velez's First Amendment claim on the ground that her speech as a community school board member was not constitutionally protected. In reaching this result, the court believed that the case was controlled (1) by cases holding that the political affiliations and the expressions of "policymakers" are not constitutionally protected from government retaliation, *see, e.g., Elrod v. Burns*, 427 U.S. 347, 367–68, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel*, 445 U.S. 507, 517–18, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and (2) by this Court's recent holding in *Camacho v.*

*Brandon*, 317 F.3d 153, 161–62 (2d Cir. 2003), that elected officials are such "policymakers." Defendants make the same argument on appeal.

For the reasons that follow, we find that *Camacho* and the Supreme Court's "policymaker" cases do not apply to the circumstance of this case, and that, as a result, Velez has properly stated a First Amendment claim. Because of our holding in *X-Men*, however, the First Amendment claim—which does lie against Chancellor Levy—cannot be brought against the defendant school board members. For other reasons, also discussed *infra*, the First Amendment claim also fails with respect to the investigators.

■ *Elrod* and *Branti* established the principle that policymaking staffers may permissibly be fired by elected officials based on the staffers' political views and associations. This exception to our First Amendment retaliation doctrine derives from a political imperative: the people's chosen representatives must be allowed to select aides who share their political views, and hence to fire—on political grounds—the aides of a previous incumbent. *See Elrod*, 427 U.S. at 367, 96 S.Ct. 2673, *Branti*, 445 U.S. at 518, 100 S.Ct. 1287. Put another way, we recognize this exception to ensure that "representative government [is] not ... undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Elrod*, 427 U.S. at 367, 96 S.Ct. 2673.

**19.** Even if these requirements are met, a government employer may fire an employee for speaking on matters of public concern if the employer fears disruption as a result of the employee's speech and if "(1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech." *Jeffries v. Harleston*, 52 F.3d 9, 13 (2d Cir.1995). This test was first articulated in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). No defense of disruption is, however, asserted in the case before us.

In *Camacho,* we faced the question of whether legislators themselves count as "policymakers" within the meaning of *El- rod* and *Branti.* The plaintiff, a legislative aide to a Yonkers city council member, was fired by the city council, with the blessing of the mayor. He brought a First Amendment retaliation claim alleging that his termination was in retaliation for the First Amendment activity of his boss, who had cast dissenting votes on the council and who had invoked the political ire of the mayor and of the majority coalition in the council. *See* 317 F.3d at 156–58. In considering the aide's claim, we began from the premise that the plaintiff's asserted right was derived from—and therefore contingent upon—the free speech right of the council member for whom he worked. *Id.* at 160.[20] In such circumstances, we deemed the council member to be a "quintessential policymaker," subject to the *El- rod/Branti* exception. We noted that council members are perceived as policymakers by the public; that they are elected officials; that they are subject to political and partisan pressure; and that their votes influence government programs. *Id.* at 162.[21] Because the council member "was a policymaker, [his aide's] First Amendment claim could not succeed" even if the defendants "retaliated against [him, and through him against his boss] for his

[boss's] political associations as well as his votes." *Id.*

As noted above, the district court found the instant case to be governed by *Camacho* and said:

> The plaintiff has alleged that the defendants retaliated against the plaintiff for actions and positions that the plaintiff took as a policymaker, namely votes that she cast or positions that she took in opposition to the actions of other policymakers such as Levy or the other members of School Board # 1. Under these circumstances, the plaintiff acted as a policymaker and was subject to retaliation for that activity without violating her First Amendment rights, and thus the First Amendment claims must be dismissed. *See Camacho,* 317 F.3d at 153.

*Velez,* 274 F.Supp.2d at 455.[22]

Velez contends, however, that it was error for the district court to find that she was a "policymaker" like the legislator in *Camacho.* On Velez's account, community board members (a) have no "real power," but exercise only an "advisory and advocacy role" as opposed to a "policymaking role"; and (b) possess no actual or required "political affiliation," being instead "ideologically and politically independent."

---

**20.** We stated:

> [Plaintiff] is not claiming that he was fired from his position as a public employee in retaliation for exercising his own First Amendment freedoms. Nor is he claiming that he was fired because of his affiliation or association with a particular political party. Rather, he claims that he was fired in retaliation for [his boss, the city council member's] activities. Thus, his claim must succeed or fail based on whether [his boss's] activities enjoyed the protection of the First Amendment.

*Camacho,* 317 F.3d at 160.

**21.** Specifically, we held: "As elected officials, council members are exempt from civil ser-

vice protection. N.Y. Civ. Serv. Law § 35(a) (McKinney 1999). They control others, such as Camacho. They are perceived as policymakers by members of the public. Their votes influence government programs. They have contact with other elected officials on the City Council. And they are responsive to partisan politics and political leaders." *Id.*

**22.** The court found that, like the city council member in *Camacho,* Velez was a "quintessential policymaker." *Id.* This was so, the district court said, because the plaintiff responded to and felt political pressure, the plaintiff's votes affected important education policies, and as an elected official, the plaintiff was perceived as a policymaker.

Because *Camacho* is inapposite for another, more fundamental, reason, we need not decide the validity of Velez's argument.

▪ *Camacho* deals with the firing of an employee of a city council member, not the stripping of the elected official's own office. The official in *Camacho* remained free to express his political views in the council chamber, to cast votes, and to serve his constituents in his capacity as a member of the council even after his assistant was terminated. By contrast, the case before us involves the outright removal of the board member, and her attendant preclusion from participating in board debates, voting, or serving her constituents. As such, Velez represents neither an *Elrod/Branti* plaintiff—a policymaking *staffer* fired for his or her allegiances to a previous administration—nor a *Camacho* plaintiff—a policymaking *staffer* let go for his or her boss's political affiliations and allegiances. *See Camacho,* 317 F.3d at 155. She falls instead into a category—an elected officeholder removed from her office, allegedly in retaliation for her (presumably faithful) representation of her constituents—as to which no exception from general First Amendment protections has heretofore been made.

▪ Thus, while the parties' appellate papers—like those filed in the court below—characterize this cause of action, against all defendants, as a straightforward *employment* retaliation suit, it is far better understood as a more basic sort of retaliation claim: adverse action by state officials—whether in or out of the employment context—against a plaintiff based on her exercise of constitutionally protected speech rights. "There is no question," the Supreme Court has said, "that speech crit-

ical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.,* 501 U.S. 1030, 1034, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). As a result, "a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed" by the First Amendment. *Friedl v. City of New York,* 210 F.3d 79, 86–87 (2d Cir.2000); *see also Greenwich Citizens Comm., Inc. v. Counties of Warren & Washington Indus. Dev. Agency,* 77 F.3d 26, 31–32 (2d Cir.1996) (distinguishing between "retaliatory First Amendment claims" and "affirmative" First Amendment claims, such as "facial challenges to statutes [and] challenges to prior restraints"). In order to state a claim for this sort of retaliation under § 1983, a plaintiff must show that (1) his actions were protected by the First Amendment; and (2) the defendant's alleged conduct was in response to that protected activity. *Friedl,* 210 F.3d at 85. Moreover, in assessing a motion to dismiss in this context, we must be satisfied that such a claim is "supported by specific and detailed factual allegations," which are not stated "in wholly conclusory terms." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

The case before us readily fits in the *Friedl* line of cases. And with respect to Levy, the plaintiff's pleadings clearly make out a colorable First Amendment retaliation claim. We cannot permit a state official to oust an elected representative of the people on the bald ground that she voices unsympathetic political views—that is, that she engages in an activity that is at the core of what is protected by the First Amendment.[23] Such an action by a state official, if allowed, would offend the basic

---

**23.** This is particularly so where the state law governing removal requires good cause, as is

the case here. *See* N.Y. Educ. L. § 2590-*l*(a).

purposes of the Free Speech clause—the facilitation of full and frank discussion in the shaping of policy and the unobstructed transmission of the people's views to those charged with decision making. *See, e.g., Bond v. Floyd,* 385 U.S. 116, 135–36, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966) ("The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy.").

Moreover, the very structure of the community board system at issue in this case supposes a striving toward these democratic ends. Members are elected to provide additional voices—to oppose, critique, supplement, modify, and suggest policies—so that the Chancellor and the City Board can more effectively deliver education to the students of New York City. That being so, extending the policymaker exception to this case, and thereby allowing the Chancellor to remove board members on political grounds, would undermine the very object of the position Velez occupies. The inapplicability of *Elrod* to a plaintiff such as Velez is therefore manifest: In *Elrod,* the Court was concerned with protecting elected officials' right to choose their advisors; here, the people of New York asserted their own right to choose those advisors themselves. We hold that to apply *Elrod* or *Camacho* here would be fundamentally inconsistent with the underlying principles at play in the "policymaker" cases.

In his concurrence in *Camacho,* Chief Judge Walker opposed the attachment of a "policymaker" label to the city council member, and in so doing he discussed a hypothetical that closely resembles the situation before us: "[Imagine if] a majority of the Council barred [the council member] from Council meetings, or otherwise prevented him from voting, in retaliation for his political associations.... I have no doubt that, were that case before us, we would find that [the council member] retained the right of free association under the First Amendment and that such retaliatory measures violated that right." *Camacho,* 317 F.3d at 166 (Walker, C.J., concurring). Significantly, the majority in *Camacho* did not disagree with the Chief Judge's conclusion. It noted instead, "[w]e are not presented with a case remotely like that. This case involves the termination of a staffer by the Council's Minority Leader in retaliation for a fellow legislator's political affiliation and vote." *Id.* at 162 n. 9.

█ Here, where we *are* squarely presented with such a case, we find ourselves in full agreement with Chief Judge Walker and hold that the First Amendment bars state officials from stripping elected representatives of their office based on the political views of such representatives. We therefore reinstate Velez's First Amendment claims as to Levy—the state actor directly responsible for her ouster from the board. In the light most favorable to the plaintiff, her basic allegation, that Levy took concrete actions to effectuate her removal from the board in retaliation for her political positions, suffices to state a constitutional claim of this sort.

With respect to the investigators and the board member defendants, however, we affirm the dismissal of the plaintiff's First Amendment claim. The investigators were responsible for the investigation, and their lack of care in conducting that investigation was undoubtedly a significant contributing factor in Levy's decision to remove the plaintiff. But the complaint does not allege that the investigators, when they botched their analysis of the board members' false charges, were motivated by a particular animus towards Velez's politics. In fact, Velez asserts just the opposite—she claims that the investi-

gators were negligent to the point of *indifference*. Because Velez does not plead a "causal connection" sufficient to show that her speech "was a motivating factor" in the investigator's actions, *Feingold*, 366 F.3d at 160, her complaint does not allege actionable retaliation by the investigators.

Under our controlling precedent, *X–Men Security, Inc. v. Pataki*, 196 F.3d 56 (2d Cir.1999), Velez's First Amendment claim also fails as to the board members. In that case, a private security firm and its employees, contracting with the state, alleged that their First Amendment rights were violated by defendant legislators when, out of racial and religious animus, and in an effort to deprive it of public contracts, the legislators made false defamatory statements. In assessing the defendants' assertion of qualified immunity, we first considered whether the plaintiffs had properly articulated a violation of their constitutional rights. We noted that the First Amendment protects legislators' rights to state publicly their criticism of public contractors and to urge that awarding a particular contract would contravene public policy. Moreover, we observed that cases "holding that a decisionmaker may not take action for impermissible reasons do not provide the proper analytical framework for claims against persons who are not decisionmakers but merely advocates." *Id.* at 70. It was imperative instead to measure the need to preserve "breathing space," *id.* at 69, for public officials freely to voice their concerns, against the speech and association rights of the public con-

tractors. In weighing those competing interests, we found "no basis on which X–Men could properly be found to have a constitutional right to prevent the legislators from exercising their own rights to speak." *Id.* at 70. As the legislators were "retaliating" against the plaintiffs by voicing their political opinions, rather than exercising some sort of legal authority, we concluded that, however outrageous the legislators' statements were, no valid federal retaliation claim existed.

*X–Men* controls Velez's First Amendment claims against the board members. Velez concedes that the board members had no legal authority over the Chancellor's removal decision and that they acted in a legislative capacity. Accordingly, though the actions of the board member defendants undoubtedly set into motion Velez's ouster, those actions cannot, consistent with *X–Men*, support a First Amendment retaliation claim. We therefore affirm the dismissal of this claim against defendants Ortiz, Goldman, and Early, as well as defendants Hyland, De-Leo, and Colon, though we reinstate it against defendant Levy.[24]

## F. Qualified Immunity

Our determination that the plaintiff has stated constitutional claims upon which relief can be granted does not end the matter, however. There is still the question of immunity.

---

24. We note that, while the board members' alleged conduct is certainly both outrageous and shocking, it cannot—insofar as its shocking character depends on the overtone of political retaliation—support a substantive due process claim. Were the board members' alleged retaliatory deeds and statements actionable under the broad notion of substantive due process, even though barred under the more particularized framework applicable to First Amendment retaliation suits, plaintiffs could easily evade *X–Men*'s prohibition against imposing federal liability on elected officials for their public pronouncements. *See Gabbert*, 526 U.S. at 293, 119 S.Ct. 1292 (holding that the "generalized notion" of substantive due process may not swallow the specific requirements of other constitutional causes of action).

The district court, after holding that the plaintiff had failed to state a constitutional claim upon which relief might be granted, nonetheless undertook a brief qualified immunity inquiry:

As explained above, the defendants' conduct, as alleged, did not constitute a violation of either the First or Fourth Amendments, or procedural or substantive due process. Consequently, with respect to these claims, the defendants could not have violated the clearly established constitutional rights of the plaintiff, and they are entitled to qualified immunity. Moreover, it could hardly be said in view of the analysis explained above that reasonable officials would have understood that their conduct violated the plaintiff's constitutional rights. Therefore, the defendants are entitled to qualified immunity for any constitutional claim against them in their personal capacities.

*Velez,* 274 F.Supp.2d at 456.

When considering qualified immunity on a motion to dismiss, we review the district court's determination *de novo,* accept as true all of the material allegations of the complaint, and draw all reasonable inferences in favor of the plaintiff. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). It is well-established that defendants are shielded by qualified immunity as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). A right is clearly established if its "contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *see also Anderson v. Recore,* 317 F.3d 194, 197

(2d Cir.2003) ("clearly established" means that "(1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful' ") (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)). Ultimately, "[t]he question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *McCullough v. Wyandanch Union Free Sch.,* 187 F.3d 272, 278 (2d Cir.1999).

Because we have dismissed plaintiff's property interest, Fourth Amendment, and substantive due process claims, we need not consider the defendants' qualified immunity assertion as to them. The same is true as to all of Velez's claims against the investigators and the board members, which, for a variety of different reasons, we have held were properly dismissed by the district court. That leaves us only with Chancellor Levy's claim of qualified immunity with regard to his asserted violations of the plaintiff's First Amendment and "stigma-plus" procedural due process rights. We conclude that qualified immunity does not, at this time, shield him from these causes of action.

### i. Procedural Due Process

Chancellor Levy asserts that we cannot reasonably expect him to have understood that his actions impermissibly abridged the plaintiff's liberty interest. He contends that, given the availability of ex post proceedings, he provided all of the process that he perceived to be "due" Velez in connection with her removal. And it is true that *DiBlasio,* which recognizes, beyond peradventure, the plaintiff's stigma-plus liberty interest in this context,

was not decided until well after the investigation had been conducted and the removal effectuated. Nevertheless, it has long been settled that due process generally requires a state to afford its citizens "some kind of hearing" prior to depriving them of liberty. *See, e.g., Hodel v. Virginia Surface Mining Reclamation Assoc.,* 452 U.S. 264, 299, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). And our circuit has also repeatedly held that the "random and unauthorized" exception referred to in our earlier analysis does not apply where the actor in question is an official with "final authority over significant matters." *See, e.g., Burtnieks v. City of New York,* 716 F.2d 982, 988 (1983); *Dwyer v. Regan,* 777 F.2d 825, 832 (2d Cir.1985). It follows that a reasonable official in Levy's position should have been aware that the failure to give an adequate pre-termination hearing violated the Fourteenth Amendment.[25]

We emphasize that this qualified immunity determination is made in view of the procedural posture of this case. Though Levy is not, as a matter of law, entitled to qualified immunity at this stage of the proceedings, a factual basis for qualified immunity may arise as the proceedings develop. It may be, after discovery, that Velez cannot adduce the facts necessary to show that Levy based his actions "on irrational and non legitimate considerations and pressures and having no rational [connection] to a legitimate state purpose," as she alleges in her complaint. But the plaintiff's assertions that they were so based are not merely conclusory, as can be seen from the Board of Education's findings, attached to the complaint, which state that the Chancellor's decision was "arbitrary and capricious" and "irrational," given that the investigation was "grossly flawed" and "could not rationally be relied

upon." At this stage of the case, we therefore cannot say that, as to the procedural due process claim, qualified immunity based on the Chancellor's good faith is appropriate. *See Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 255 (2d Cir.2001) (finding, at the motion to dismiss stage, that defendants could not establish as a matter of law that they were entitled to qualified immunity).

### ii. First Amendment

■ Levy also presses a qualified immunity defense to Velez's First Amendment claim. He bases his argument on the existence of *Camacho.* While he concedes that *Camacho* was decided after the investigation and removal, Levy contends that the case validates his "objectively reasonable" view that removal of an elected official on political grounds is not constitutionally infirm. As we have stated, however, *Camacho* does not in any way govern this case, for it was specifically concerned with the firing of employees of elected officials, not the ouster of the officials themselves. *Bond,* on the other hand, established nearly forty years ago that the exclusion of an officeholder from her office in retaliation for her political views is a violation of the First Amendment. *See Bond,* 385 U.S. at 137, 87 S.Ct. 339 ("We . . . hold that the disqualification of Bond from membership in the Georgia House because of his statements violated Bond's right of free expression under the First Amendment."). Chief Judge Walker's concurrence in *Camacho* took note of this principle, 317 F.3d at 166, and the majority in *Camacho* did not at all contest it. Moreover, *Friedl,* decided in 2000—two years before the events in the instant case—made clear that government officials may not take adverse, punitive action

---

**25.** And, for the reasons noted in note 17, *supra,* there is nothing in *Donato* that should

have led an official, like Levy, to conclude otherwise.

against individuals in retaliation for the exercise of their constitutional rights (here, Velez's right as an elected official to voice her positions). 210 F.3d at 85–86. Accordingly, if it is true, as asserted by Velez, that Levy acted deliberately to bring about Velez's removal in retaliation for her political views, he cannot avail himself of qualified immunity.[26]

## III. CONCLUSION

We find that the behavior alleged in Velez's complaint—an intentional effort, born of political animus, to deprive an elected officeholder of her good reputation and her right to represent her constituents—gives rise to two causes of action under the Constitution. The district court properly dismissed, for failure to state a claim, the plaintiff's due process property interest, substantive due process, and Fourth Amendment claims. It also properly dismissed all claims against the investigators and the board members. But the court erred in dismissing Velez's stigma-plus liberty interest and First Amendment claims against Chancellor Levy, and in finding that Levy was entitled to qualified immunity on these claims. Since federal causes of action remain *sub judice*, it follows that any dismissal of Velez's state law claims for want of supplemental jurisdiction is at the least premature, and these claims must be reinstated. The judgment below is therefore AFFIRMED in part, and VACATED in part, and the case is REMANDED for further proceedings consistent with this opinion. Costs will abide the ultimate result.

---

**26.** Once again, we note that if some of Velez's factual assertions eventually do not prove out, a finding of qualified immunity may, at that time, be appropriate.