**Anthony DINGLE, Plaintiff,**

**v.**

**The CITY OF NEW YORK, the New York City Housing Authority, and Demetrice Gadson, in her individual capacity, Defendants.**

**No. 10 Civ. 4(SAS).**

United States District Court, S.D. New York.

July 28, 2010.

Michael J. Borrelli, Esq., Eric Z. Reimer, Esq., Borrelli & Associates, P.L.L.C., Carle Place, NY, for Plaintiff.

Jeffrey M. Niederhoffer, Esq., Sonya M. Kaloyanides, Esq., New York City Housing Authority Law Department, New York, NY, for Defendants.

## OPINION AND ORDER

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

Anthony Dingle brings this action against his employer, the City of New York,[1] the New York City Housing Authority ("NYCHA"), and his supervisor, Demetrice Gadson, for claims arising under section 1983 of Title 42 of the United States Code ("section 1983"), state common law, and section 75–b of the Civil Service Law of New York ("section 75–b").[2] Dingle alleges that the NYCHA and Gadson retaliated against him in violation of his First Amendment right to free speech, violated his due process liberty interest in freedom from stigmatization,

defamed him, and took adverse actions against him as a result of his disclosure of a public health and safety violation. Defendants now move for judgment on the pleadings. For the reasons discussed below, Defendants' motion is granted in part and denied in part.

## II. BACKGROUND [3]

Dingle has worked for the NYCHA, "a public authority created to build, operate and maintain public housing for low-income tenants of the City of New York," [4] since 1990.[5] He became a superintendent in 2004, and first met Gadson, a deputy director in NYCHA's Manhattan Management Department, when she became his supervisor in 2006.[6] Dingle started working at his current location, the Polo Grounds Towers in Manhattan, on February 14, 2007.[7] As a superintendent, Dingle is responsible for oversight of the clerical work, mechanical and janitorial departments within the Polo Grounds. He is responsible for resolving issues including leaking pipes, broken locks, defaced walls, and cracked flooring. He disciplines the staff at the Polo Grounds and doles out their assignments. He helps ensure that the myriad clerical work required for the operation of [a NYCHA] building is timely and properly filed.[8]

Dingle initially related his belief that there are too few NYCHA employees at

1. On February 4, 2010, Dingle withdrew his claims against the City of New York. *See* Stipulation of Dismissal for Defendant the City of New York (Docket No. 5).

2. Dingle originally brought claims under sections 740 and 741 of the New York Labor Law. *See* Complaint ("Compl.") ¶¶ 109–113. He has since abandoned these claims. *See* Dingle's Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings ("Opp. Mem.") at 16.

3. The following factual allegations are accepted as true for purposes of this motion.

4. Memorandum of Law of Defendants in Support of Their Motion for Judgment on the Pleadings ("Def. Mem.") at 4.

5. *See* Compl. ¶ 9.

6. *See id.* ¶¶ 1(n), 12; Answer ¶ 7.

7. *See* Comply ¶ 13.

8. *Id.* ¶ 5.

the Polo Grounds on June 8, 2007, in an email requesting overtime "to deal with the over burdensome workload Gadson was requiring Mr. Dingle to do and to complain about being understaffed."[9] On June 20, 2007, Dingle sent an email to three higher-level employees in the NY-CHA, stating that he needs supervisory assistance to meet his deadlines.[10] He alleges that "in retaliation for his speaking out, [he] was given a multi-page list of tasks that needed completion per Gadson's orders."[11] He also alleges, in general terms, that the "understaffing of the Polo Grounds posed a danger to the health and safety of residents and their guests ... and [he] spoke out about these issues continuously and frequently ...,"[12] and that Gadson continued to retaliate against him based on his actions.[13]

On August 14, 2007, Gadson instructed Helen Itzkowitz, a manager with the NY-CHA, to issue a counseling memorandum against Dingle for failing to adequately monitor apartment move-outs.[14] Dingle attributes this to retaliation.[15] He further alleges that Gadson had Itzkowitz reissue a counseling memorandum for retaliatory

purposes on September 20, 2007, after Dingle met with Gadson and another supervisor to discuss "chronic understaffing, the onerous and harassing nature of his relationship with Gadson, and ... his right to speak out about issues that affected the health and safety of the public at the Polo Grounds."[16]

Additional allegations of retaliation by Gadson based on Dingle's continuous remarks about understaffing include disparate treatment in disciplinary action and assignment of duties,[17] Gadson's denial, without explanation, of Dingle's request to be transferred to a location in the Bronx to better handle his son's disability,[18] verbal harassment via email,[19] reassignment of Dingle's subordinate employees while he was away on vacation,[20] excessive disciplinary liability for infractions committed by his subordinates,[21] unwarranted counseling memoranda,[22] and increased workloads under a reduced support staff (and consequent counseling memoranda for failure to complete such workloads).[23]

After Dingle emailed Robert Knapp,[24] complaining about a hostile work environment, Knapp held a meeting with Dingle

---

**9.** *Id.* ¶ 16.

**10.** *See id.* ¶ 18; Answer ¶ 18.

**11.** Compl. ¶ 21.

**12.** *Id.* ¶ 24.

**13.** *See id.* ¶ 25.

**14.** *See id.* ¶ 26.

**15.** *See id.* ¶ 25.

**16.** *Id.* ¶ 28; *see id.* ¶ 29.

**17.** *See id.* ¶¶ 30, 54–59, 69(d).

**18.** *See id.* ¶ 31–35.

**19.** *See id.* ¶¶ 40–41, 69(i).

**20.** *See id.* ¶ 69(a).

**21.** *See id.* ¶ 69(1).

**22.** *See id.* ¶¶ 69(m) (Counseling Memorandum dated April 17, 2009, for Dingle's failure to make specific repairs. Dingle had actually made the repairs when requested. By the time Gadson inspected the repairs after a significant lapse of time, vandalism had destroyed much of Dingle's work), 69(n) (Counseling Memorandum dated May 4, 2009, because Dingle failed to be present when maintenance staff drilled out an apartment due to flooding. However, a NYCHA manager improperly instructed the workers to execute the drill-out while Dingle was at lunch).

**23.** *See id.* ¶¶ 46–49, 69(b), 69(f), 69(g).

**24.** Neither party specifies Knapp's exact position but it can be inferred that he had authority over both Dingle and Gadson. Regardless, his title does not materially affect this Court's opinion.

and Gadson in early February 2008, but no remedial action was taken against Gadson, as she denied all allegations of retaliation.[25] On February 20, 2008, Dingle complained about a hostile work environment to the Union Office.[26]

Dingle alleges that Gadson and the NYCHA further retaliated against him because he accused Gadson of violating both the NYCHA "Standard Procedures" and the law (specifically, the Fourth Amendment), and endangering public health and safety.[27] One such violation occurred on December 29, 2008, when "Gadson directed a secretary to open a safe for her in Mr. Dingle's absence," contravening NYCHA policy that "dictates that a [m]anager be present when a safe is opened."[28] Another allegation states that, in February and April 2009, Gadson authorized the "illegal entry into apartments by drilling out locks on apartments whose tenants were not paying rent"[29] by "generating false 'gas leak' reports or just improperly drilling out apartments that she unilaterally, and in contravention to policy categorized as

abandoned."[30] Moreover, on April 1, 2009, Gadson instructed Dingle to store seven unused refrigerators at the Polo Grounds, although this location "is not equipped to properly store seven (7) refrigerators . . . ."[31]

In addition to reporting these violations to "various [NYCHA m]anagers,"[32] Dingle specifically discussed these issues with the NYCHA's Department of Equal Opportunity ("DEO") on May 7, 2009.[33] On May 11, 2009, the DEO informed Dingle "that they do not have jurisdiction regarding his issue . . . ."[34] On June 30, 2009, Dingle filed a complaint with the NYCHA Inspector General's office "about Gadson's mandates to commit and sanctioning [sic] of illegal activities."[35] Dingle is not aware of any action taken by the Inspector General's office addressing this complaint.[36]

After Dingle's reports, discussions, and complaints concerning Gadson's violations and the unresolved understaffing problem, Gadson continued to allegedly retaliate against Dingle by, inter alia, issuing more unfair counseling memoranda[37] and serv-

---

25. *See id.* ¶¶ 42–45.

26. *See id.* ¶ 50.

27. *See id.* ¶¶ 60–65.

28. *Id.* ¶ 66(a).

29. *Id.* ¶ 64. NYCHA's procedures require that "[t]he only circumstance under which such an apartment with delinquent rent payments can be entered is when the door to the apartment is unlocked." *Id.* ¶ 62.

30. *Id.* ¶ 65.

31. *Id.* ¶ 66(b).

32. *Id.* ¶ 69.

33. *See id.* ¶ 67; *see also* Answer ¶ 67.

34. Compl. ¶ 67.

35. *Id.* ¶ 68.

36. *See id.*

37. *See id.* ¶¶ 69(*o* ) (Counseling Memorandum dated June 15, 2009, for failing to order material requested on May 28, 2009, despite only being at work for one and a half days between May 27, 2009 and June 8, 2009), 73 (Counseling Memorandum dated July 8, 2009, for "allowing a summer youth worker to stay past his work hours and giving him access to the computer system," although "Gadson herself used the youth workers in this capacity"), 77 (Counseling Memorandum dated August 26, 2009, "for his failure to ensure that the fire extinguisher contractor properly inspected all fire extinguishers" although "his signature was merely to authorize the document for forwarding." Gadson did not allow Dingle to issue counseling memoranda regarding this occurrence to his subordinates), 91 (Counseling Memorandum dated November 17, 2009, resulting from a "heated discussion" between Dingle and Gadson concerning an illness coverage question); *see also* Affidavit of Anthony Dingle ("Dingle Aff."), attachment to Opp. Mem., ¶¶ 11 (Counseling Memorandum dated November 5, 2009, for failure to correct prob-

ing him with a Notice of Local Hearing a day before he was to leave for a vacation.[38]

In one instance, Dingle alleges that Gadson's behavior was "misleading and defamatory." [39]

On or about July 13, 2009, Gadson ... found there was no Supervisor of Caretakers on duty [at the Polo Grounds]. Thomas Aviles that [sic] Supervisor of Caretakers of Technical Services had previously told Mr. Dingle that Mr. Torres would be covering that slot in the schedule. Torres in fact was not on duty at this time, however, there were two (2) Assistant Superintendents [sic] workers, who were Torres' supervisors [sic] were on duty at the Polo Grounds when Gadson arrived. Gadson sent an email to Knapp and other Administrators stating that she had to call in a supervisor to cover for the day.[40]

On August 26, 2009, "Dingle sent an email to request Local 237 Representative Ramilda Ferguson ... to attempt [sic] set up a meeting with Knapp. Mr. Dingle was told by Ferguson that Knapp refused to meet them regarding Mr. Dingle and Gadson." [41]

A Local Hearing was held on September 16, 2009.[42] The charges against Dingle were "Incompetency and/or Misconduct for the February 2009, and March 5, 23, 2009 and April 17, 2009 Disciplinary Memoranda. Arbitration on this matter is as yet pending." [43]

Dingle filed suit in this Court on January 4, 2010. Dingle alleges that he suffered from, inter alia, vomiting, stomach pains, and a bleeding prostate—all resulting from a stressful working environment created by Gadson.[44] Defendants answered on April 16, 2010, asserting, inter alia, defenses of qualified immunity and failure to adequately allege municipal liability.[45]

In an Affidavit attached to his opposition brief, Dingle further contends that after he filed suit in this Court on January 4, 2010, Gadson, in retaliation, "attempted to put into the process the mechanics to permanently terminate" him by setting up a Local Hearing on February 17, 2010, for an incompetency charge.[46] Dingle states, in his Affidavit, that

I was found "not guilty" of both the August 2009 and November 19, 2009 incidents, yet despite my clear and convincing evidence to the contrary, was found "guilty" of the November 5, 2009 and July 11, 2009 incidents. Based on these disciplinary charges, I was docked two (2) days of accrued annual leave and lost resulting pay.[47]

Additionally, on April 21, 2010, after Dingle sent an email to Knapp which discussed Dingle's difficulties with Gadson relating to a request that he made on November 4, 2009, for maintenance materials, Dingle alleges that Gadson

---

lems "which would have arisen after working hours from the evening before."), 12 (describing the November 17, 2009 Counseling Memorandum as based on false allegations of violent language and behavior).

**38.** *See* Compl. ¶ 72 ("A Local Hearing is the first step toward stripping [a NYCHA] employee of his position.").

**39.** · *Id.* ¶ 74.

**40.** *Id.*

**41.** *Id.* ¶ 79.

**42.** *See id.* ¶ 82.

**43.** *Id.*

**44.** *See id.* ¶¶ 70–71, 88–89.

**45.** Answer at 19–20.

**46.** Dingle Aff. ¶ 13.

**47.** *Id.* ¶ 14.

sent a defamatory email to [Dingle] with a cc to all NYCHA supervisory personnel including Mr. Knapp, Mr. Ginsberg and Ms. Teri Dawson, stating in a bold large font type that [he] was "incompeten[t]," "failed to perform [his] duties," that [he] needed to "reevaluate [his] responsibilities as a superintendent" .... [48]

## III. APPLICABLE LAW

### A. Rule 12(c) Judgment on the Pleadings

█ Under Rule 12(c), after the pleadings close but before the trial begins, a party may move for judgment on the pleadings provided that the motion is made early enough so as not to delay the trial.[49] A party is entitled to judgment on the pleadings only if it is clear that no material issues of fact remain to be resolved and that it is entitled to judgment as a matter of law.[50]

█ " 'The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim.' " [51] In either instance, the court must accept as true the non-movant's allegations, along with the allegations in the movant's pleading that the non-movant has admitted, and must draw all reasonable inferences in the non-movant's favor.[52] The court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness." [53]

█ The allegations in a complaint must meet a standard of "plausibility." [54] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that [plaintiff is entitled to relief]." [55] Plausibility "is not akin to a probability requirement;" rather plausibility requires "more than a sheer possibility...." [56] Pleading a fact that is "merely consistent with a defendant's liability" does not satisfy the plausibility standard.[57]

█ The court "must limit itself to the facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." [58] A document is considered incorporated by reference if it is "in a pleading ... adopted by reference elsewhere in the same pleading or in any other pleading ...." [59] A court may also consider a document not specifically incorporated by reference but on which the complaint

**48.** *Id.* ¶ 17.

**49.** *See* Fed.R.Civ.P. 12(c).

**50.** *See Burns Int'l Sec. Servs. v. International Union, United Plant Guard Workers of Am.*, 47 F.3d 14, 16 (2d Cir.1995); *Carballo ex rel. Cortes v. Apfel*, 34 F.Supp.2d 208, 214 (S.D.N.Y.1999).

**51.** *Wachovia Corp. v. Citigroup, Inc.*, 634 F.Supp.2d 445, 450 (S.D.N.Y.2009) (quoting *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 520 (2d Cir.2006)).

**52.** *See id.*

**53.** *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir.2007) (quotation marks omitted).

**54.** *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 564, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

**55.** *Ashcroft v. Iqbal*, —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quotation marks omitted).

**56.** *Id.* (quotation marks omitted).

**57.** *Id.* (quotation marks omitted).

**58.** *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir.1991).

**59.** Fed.R.Civ.P. 10(c).

heavily relies and which is integral to the complaint.[60]

## B. Section 1983

 Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." [61] In order to state a claim under section 1983, a plaintiff must show that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution.[62]

### 1. First Amendment Retaliation

 To establish a retaliation claim in violation of the First Amendment right to free speech, a plaintiff must show *first,* that the speech at issue was protected; *second,* that he suffered an adverse employment action; and *third,* that there exists a causal connection between the protected speech and the adverse employment action.[63] With respect to the first prong, the Supreme Court has made clear that "public employees do not surrender all of their First Amendment rights by reason of their employment." [64] "Whether public employee speech is protected from retaliation under the First Amendment entails two inquiries: (1) 'whether the employee spoke as a citizen on a matter of public concern' and, if so, (2) 'whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.' " [65]

 The Supreme Court has stated that when a public employee makes statements pursuant to his official duties, he does not speak as a citizen for First Amendment purposes.[66] Accordingly, "the Constitution does not insulate [an employee's] communications from employer discipline" based on the employer's reaction to the speech.[67] Thus, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen." [68] The Supreme Court rejected the "notion that the First Amendment shields from discipline the expressions [public] employees make pursuant to their professional duties." [69] Moreover, the Second Circuit has ruled that "speech can be 'pursuant to' a public employee's official job duties even

**60.** *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002).

**61.** *Morris–Hayes v. Board of Educ. of Chester Union Free Sch. Dist.,* 423 F.3d 153, 159 (2d Cir.2005) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

**62.** *See Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004).

**63.** *See Singh v. City of New York,* 524 F.3d 361, 372 (2d Cir.2008).

**64.** *Garcetti v. Ceballos,* 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).

**65.** *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (quoting *Garcetti,* 547 U.S. at 417, 126 S.Ct. 1951).

**66.** *See Garcetti,* 547 U.S. at 421, 126 S.Ct. 1951 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").

**67.** *Id.*

**68.** *Id.* at 421–22, 126 S.Ct. 1951 ("Our precedents do not support the existence of a constitutional cause of action behind every statement a public employee makes in the course of doing his or her job").

**69.** *Id.* at 426, 126 S.Ct. 1951.

though it is not required by, or included in, the employee's job description, or in response to a request by the employer."[70]

 "Employee expression is not a matter of public concern when it 'cannot be fairly considered as relating to any matter of political, social, or other concern to the community.' "[71] " '[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision.' "[72] "In making its determination, the court should focus on the motive of the speaker, and attempt to discern whether the speech was calculated to redress personal grievances or whether it had a broader public purpose."[73]

 If an employee spoke as a citizen on a matter of public concern, a First Amendment claim may, but does not automatically, arise. The next question is "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."[74]

This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.[75]

"So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."[76]

### 2. Due Process Liberty Interest

██ Pursuant to the Due Process Clause of the Fourteenth Amendment, a state may not deprive an individual of liberty or property without due process of law.[77] In order to prevail on a procedural due process claim, a plaintiff must identify a constitutionally protected liberty or property interest and demonstrate that the state has deprived him of that interest without due process of law.[78]

 It is well established that damage to one's reputation is not "by itself sufficient to invoke the procedural protection of the Due Process Clause."[79] As the Supreme Court stated in *Paul v. Davis:*

While we have in a number of our prior cases pointed out the frequently drastic

---

70. *Weintraub v. Board of Educ. of City Sch. Dist. of City of New York,* 593 F.3d 196, 203 (2d Cir.2010).

71. *Singh,* 524 F.3d at 372 (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

72. *Id.* (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. 1684).

73. *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 722 (S.D.N.Y.2005).

74. *Garcetti,* 547 U.S. at 418, 126 S.Ct. 1951.

75. *Id.*

76. *Id.* at 419, 126 S.Ct. 1951.

77. *See* U.S. Const. amend. XIV.

78. *See Weinstein v. Albright,* 261 F.3d 127, 134 (2d Cir.2001); *see also Local 342 v. Town Bd. Of Huntington,* 31 F.3d 1191, 1194 (2d Cir.1994). Dingle's alleged deprivation of a liberty interest falls under procedural due process, although he alleges violations of substantive due process. *See* Compl. ¶ 106 ("Defendants ... violated Plaintiff's Constitutional rights by denying him substantive due process by engaging in reckless, intentionally damaging behavior, stigmatizing him and foreclosing him from pursuing other job opportunities and publicly disclosing false allegations of Plaintiff's incompetence.").

79. *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "properly" by itself sufficient to invoke the procedural protection of the Due Process Clause.[80]

The Second Circuit has interpreted this to mean that "stigma plus" is required to establish a constitutional violation where reputation is the primary issue.[81] To prevail on a "stigma plus" claim, a plaintiff must establish the following: (1) a "stigma" by showing "the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false;" (2) a "plus" by showing "a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights;"[82] and that "both 'stigma' and 'plus' are claimed to be sufficiently proximate."[83]

Establishment of a stigma requires the plaintiff to assert that the injurious remarks are false[84] and that Defendants' actions "will result in stigma, that is, in 'public opprobrium' and damage to [his] reputation."[85] In the context of job performance, the remarks must "'denigrate the employee's competence as a professional and impugn the employee's professional reputation in such a fashion as to effectively put a significant roadblock in that employee's continued ability to practice his ... profession.'"[86] A statement that an employee merely performed a job poorly or acted in an improper manner is not sufficient.[87] Statements that "describe problems within the employee's power to correct" are not stigmatizing.[88]

To establish the "plus", a plaintiff cannot rely merely on "'the deleterious effects which flow directly from a sullied reputation'" such as "the impact that defamation might have on job prospects, or, for that matter, romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation."[89] Al-

80. *Id.*

81. *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir.2004). *Accord Valmonte v. Bane*, 18 F.3d 992, 999 (2d Cir.1994).

82. *Vega v. Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (quotation marks omitted).

83. *Velez v. Levy*, 401 F.3d 75, 89 (2d Cir. 2005).

84. *See Vega*, 596 F.3d at 82 (citing *Codd v. Velger*, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977)).

85. *Valmonte*, 18 F.3d at 999. *Accord Velez*, 401 F.3d at 87 ("The defamatory statement must be sufficiently public to create or threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily does not implicate a liberty interest.").

86. *Segal v. City of New York*, 459 F.3d 207, 212 (2d Cir.2006) (quoting *Donato v. Plain-view–Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 630–31 (2d Cir.1996)).

87. *See O'Neill v. City of Auburn*, 23 F.3d 685, 692 (2d Cir.1994) ("An accusation that a licensed professional is incompetent is 'considerably graver' ... than a statement that the individual performed a job poorly").

88. *Id.*

89. *Valmonte*, 18 F.3d at 1001. *Accord Siegert v. Gilley*, 500 U.S. 226, 234, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) ("Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* [*v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)] action.").

though "it is not entirely clear what the 'plus' is,"[90] the Second Circuit has made the standard less ambiguous by determining that the "plus" is satisfied by deprivation of the plaintiff's property or termination of the plaintiff's government job or some other right or status.[91]

A sufficiently proximate relationship between the "stigma" and the "plus" will be satisfied where (1) the stigma and plus would, to a reasonable observer, appear connected—for example, due to their order of occurrence, or their origin—and (2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so. There is no rigid requirement, therefore, that both the "stigma" and the "plus" must issue from the same government actor or at the same time.[92]

### 3. Qualified Immunity

Government officials performing discretionary functions are generally granted qualified immunity and are immune from suit provided that " 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "[93] "[A] qualified immunity defense can be presented in a [motion to dismiss], but . . . the defense faces a formidable hurdle when advanced on such a motion."[94]

### 4. Municipal Liability

For a person deprived of a constitutional right to have recourse against a municipality under section 1983, he or she must show harm that results from a municipal "policy" or "custom."[95] For a municipality's failure to train or supervise to constitute a "policy or custom" actionable under section 1983, a plaintiff must establish that the municipality's failure to train reveals a " 'deliberate indifference' " to the citizen's rights.[96]

The Second Circuit set out three requirements that must be met for failure to train or supervise to be considered deliberate indifference:

First, the plaintiff must show that a policymaker knows "to a moral certainly" that her employees will confront a given situation. . . . Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation. . . . [Third,] the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.[97]

---

90. *Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir.1989). *Accord Sadallah*, 383 F.3d at 38.

91. *See Sadallah*, 383 F.3d at 38.

92. *Velez*, 401 F.3d at 89.

93. *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Wilson v. Layne*, 526 U.S. 603, 614, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)).

94. *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir.2004).

95. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Accord Board of*

*County Comm'rs v. Brown*, 520 U.S. 397, 402, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–81, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

96. *Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir.2007) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

97. *Walker v. City of New York*, 974 F.2d 293, 297–298 (2d Cir.1992).

Additionally, plaintiffs must offer facts showing a causal relationship between the inadequacies of the training program and the alleged constitutional violations.[98]

### C. New York State Claim Requirements

Section 50–i of the New York General Municipal Law provides that no tort action shall be prosecuted or maintained against a municipality or any of its officers, agents, or employees unless: (1) a Notice of Claim has been served against the municipality; (2) the municipality has refused adjustment or payment of the claim; and (3) the action is commenced within one year and ninety days after the event upon which the claim is based occurred.[99] Section 50–e requires that the Notice of Claim be filed "within ninety days after the claim arises."[100]

Section 157 of the New York Public Housing Law ("section 157") states specifically that

> [i]n every action ... against an authority ..., the complaint or necessary moving papers shall contain an allegation that at least thirty days have elapsed since the demand, claim or claims upon which such action ... is founded were presented to the authority for adjustment and that it has neglected or refused to make an adjustment or payment thereof for thirty days after such presentment.[101]

Section 157 further states that

> [a]n action against an authority ... for damages for personal injuries, alleged to have been sustained by reason of the negligence of, or by the creation or maintenance of a nuisance by said authority, or any member, officer, agent or employee thereof, shall be commenced within one year and ninety days after the cause of action therefor shall have accrued, provided that a notice of the intention to commence such action shall have been served upon the authority. *All the provisions of section fifty-e of the general municipal law shall apply to such notice.*[102]

New York's notice of claim requirements are not applicable to section 1983 claims brought in federal court.[103] However, the requirements do apply to state law personal injury claims that are brought in federal court.[104] Actions brought under section 75–b of the Civil Service Law of New York must also comply with the Notice of Claim requirements.[105] Federal courts do not have jurisdiction to hear state law claims brought

---

98. *See Amnesty America v. Town of West Hartford*, 361 F.3d 113, 129 (2d Cir.2004) (citing *Harris*, 489 U.S. at 391, 109 S.Ct. 1197).

99. *See* N.Y. Gen. Mun. Law § 50–i.

100. *Id.* § 50–e(a).

101. N.Y. Pub. Hous. Law § 157(1).

102. *Id.* § 157(2) (emphasis added).

103. *See Day v. Moscow*, 955 F.2d 807, 814 (2d Cir.1992). *Accord Horvath v. Daniel*, No. 04 Civ. 9207, 2006 WL 47683, at *3 (S.D.N.Y. Jan. 9, 2006) ("Courts in this Circuit have repeatedly held that the notice of claim requirement is not applicable to federal claims under section 1983.").

104. *See, e.g., Shakur v. McGrath*, 517 F.2d 983, 985 (2d Cir.1975) (dismissing state mal-practice claims that were added to a section 1983 complaint nine months after the complaint was filed because state notice of claim requirements were not satisfied). *See also Horvath v. Daniel*, 423 F.Supp.2d 421, 424–25 (S.D.N.Y.2006) ("Although we retain jurisdiction over plaintiff's [section] 1983 action, we lack authority to permit plaintiff to file a late Notice of Claim and therefore dismiss plaintiff's state law claims without prejudice.").

105. *See Donas v. City of New York*, 62 A.D.3d 504, 878 N.Y.S.2d 360, 360 (1st Dep't 2009). *Accord Williams v. County of Nassau*, 684 F.Supp.2d 268, 295 (E.D.N.Y.2010) ("There is no dispute here that plaintiffs failed to file a notice of claim with respect to their Section 75–b claims.")

by plaintiffs who have failed to comply with the notice of claim requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim.[106]

### D. Amendments to Pleadings

■ "Rule 15(a) provides that, other than amendments as a matter of course, 'a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.' "[107] "[W]hether to permit a plaintiff to amend its pleadings is a matter committed to the Court's sound discretion."[108] According·to the Supreme Court

[i]f the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."[109]

Therefore, " '[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.' "[110]

## IV. DISCUSSION

### A. Federal Claims

#### 1. Dingle Has Sufficiently Pled First Amendment Retaliation

##### a. Dingle Engaged in Protected Speech

■ The crux of the parties' dispute on Dingle's First Amendment retaliation claim relates to whether Dingle engaged in protected speech. For purposes of the instant motion, Dingle has adequately pled that he "spoke as a citizen on a matter of public concern"[111] and consequently satisfied the first prong of the protected speech test. Dingle repeatedly contends that his speech constituted complaints about the "chronic understaffing of the Polo Grounds [that] posed a danger to the health and safety of residents."[112] Although Dingle does not mention specific instances of health and safety problems within the Polo Grounds, it is certainly plausible that, because NYCHA employees are responsible for taking care of problems such as "leaking pipes, broken locks, defaced walls, and cracked flooring,"[113] understaffing may

**106.** *See Gibson v. Commissioner of Mental Health*, No. 04 Civ. 4350, 2006 WL 1234971, at *5 (S.D.N.Y. May 8, 2006); *Brown v. Metropolitan Transp. Auth.*, 717 F.Supp. 257, 260 (S.D.N.Y.1989) ("Until the state legislature amends § 50–e(7) to include federal trial courts, we have no choice but to dismiss for lack of jurisdiction plaintiff's application to file a late notice of claim or to have his notice of claim deemed timely filed.").

**107.** *Slayton v. American Express Co.*, 460 F.3d 215, 226 n. 10 (2d Cir.2006) (quoting Fed. R.Civ.P. 15(a)).

**108.** *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir.2007) (quotation marks and citation omitted).

**109.** *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). *Accord Jin v. Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir.2002).

**110.** *Vacold LLC v. Cerami*, No. 00 Civ. 4024, 2002 WL 193157, at *6 (S.D.N.Y. Feb. 6, 2002) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991)). *Accord Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir.1999) ("When a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint.").

**111.** *Ruotolo*, 514 F.3d at 188.

**112.** Compl. ¶ 24.

**113.** *Id.* ¶ 15.

lead to an unsafe environment for many residents of the Polo Grounds.

Additionally, Dingle contends that his "discussion of Gadson's failure to comport her behavior with [NYCHA] policies and procedures and the misuse of power by [NYCHA] administration . . . is protected under the First Amendment as speech by a public employee on matters of public concern." [114] Gadson's violations, as alleged, are directly related to the public interest, as they concern the well-being of Polo Grounds residents. Dingle states that, in allegedly generating false "gas leak" reports and entering potentially occupied apartments without authorization, Gadson jeopardized "the health and safety of the public who may be subjected to dangerous situations in the event that such an entry leads to the use of guns [sic] etc." [115]

Defendants argue that Dingle's remarks were "made in furtherance of [his] job duties because they were part and parcel of his concerns about his ability to properly perform his job as a Superintendent and therefore do not have First Amendment Protection." [116] Defendants further argue that the Complaint makes clear that Dingle's remarks about understaffing were related to his employment and professional duties. [117] However, the Supreme Court has held that a public employee's speech is unprotected if it relates to "matters *only* of personal interest." [118] Because Dingle's speech about the understaffing problem relates to matters of public concern, it is protected, regardless of whether Dingle's personal interest is also at stake.

The second prong of the protected speech test—"whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public" [119]—is not disputed by the parties. [120] In suppressing Dingle's speech, Defendants are not serving their interests in operating efficiently or effectively. Essentially, Dingle's speech was not a threat to the Defendants' operations.

### b. Dingle Suffered an Adverse Employment Action [121]

Dingle has offered sufficient facts to support his allegation that he suffered adverse employment actions. In *Zelnick v. Fashion Institute of Technology,* the Second Circuit established that

> [i]n the context of a First Amendment retaliation claim, we have held that only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action. In this context, adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand. This list of retaliatory conduct is certainly not exhaustive, however, and lesser actions may also be considered adverse employment actions. Adverse employment actions may include negative evaluation letters . . . . [122]

---

114. *Id.* ¶ 96.

115. *Id.* ¶ 63.

116. Opp. Mem. at 11 (citing *Weintraub,* 593 F.3d at 202–04).

117. *See* Compl. ¶ 16 (Dingle's first mention of the understaffing problem was made while he was complaining about "the over burdensome workload Gadson was requiring Mr. Dingle to do").

118. *Connick,* 461 U.S. at 147, 103 S.Ct. 1684 (emphasis added).

119. *Ruotolo,* 514 F.3d at 188.

120. *See* Opp. Mem. at 10.

121. Defendants do not contest that Dingle suffered adverse employment actions. *See id.*

122. 464 F.3d 217, 225–26 (2d Cir.2006) (quotation marks, citations, and brackets omitted).

Dingle alleges that he was subjected to adverse employment actions including numerous counseling memoranda, unequal treatment, verbal harassment, and an increased workload.[123]

### c. Dingle Has Pled a Causal Connection Between His Speech and the Adverse Employment Action [124]

 Dingle has also sufficiently alleged a causal connection between his speech and the adverse employment actions. Although temporal proximity is strong circumstantial evidence of improper intent,[125] because Dingle frequently engaged in the protected speech for a several-year period—not only before the adverse employment actions—this Court's ability to infer causation solely based on a temporal connection is weakened.[126]

 Nevertheless, causation is sufficient because Dingle alleges specific connections between his speech and adverse employment actions. For example, immediately after a meeting concerning Dingle's complaints among Knapp, Gadson, and Dingle on September 20, 2007, Gadson "approached Itzkowitz and demanded that a Counseling Memo be reissued against Mr. Dingle that had been issued the week before." [127]

### 2. Dingle's Due Process Liberty Interest in Freedom from Defamation Claim Is Dismissed

Because Dingle does not adequately plead a violation of his due process liberty interest in freedom from defamation, this claim is dismissed with prejudice. Dingle alleges, in general terms, that Defendants "engag[ed] in reckless, intentionally damaging behavior, stigmatizing him and foreclosing him from pursuing other job opportunities and publicly disclosing false allegations of Plaintiff's incompetence." [128]

 To sufficiently plead a stigma plus claim, the stigmatizing remarks must be specifically alleged to be false. Dingle only points to three instances of false public statements—two counseling memoranda (one of which was later rescinded) and one email sent to several NYCHA administrators.[129] These statements, however, cannot be considered "sufficiently derogatory to injure" Dingle's reputation," [130] as they described Dingle as "perform[ing] a job poorly." As a matter of law, such statements are not considered to be stigmatizing.[131]

 Even if these allegations did meet the "stigma" requirement, a stigma plus claim is still not sufficiently stated because Dingle does not satisfy the "plus" requirement. Dingle does not provide a factual basis for his allegation that Defendants foreclosed him from "pursuing other job opportunities." [132] Dingle additionally

---

**123.** See *supra* notes 17–23, 37–38 and accompanying text.

**124.** Defendants do not contest that Dingle has pled a causal connection between his speech and the adverse employment action. *See* Opp. Mem. at 10.

**125.** *See Gorman–Bakos v. Cornell Coop. Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001).

**126.** See *McCullough v. Wyandanch Union Free Sch. Dist.,* 187 F.3d 272, 280 (2d Cir. 1999).

**127.** Compl. ¶ 29.

**128.** *Id.* ¶ 106.

**129.** *See id.* ¶¶ 69(m), 69(n), 74. In his Affidavit, Dingle alleges that he received a counseling memorandum in connection with this email. *See* Dingle Aff. ¶¶ 8–9.

**130.** *Vega,* 596 F.3d at 81.

**131.** *See O'Neill,* 23 F.3d at 692.

**132.** Compl. ¶ 106.

alleges that the false statements arising from the July 11, 2009 incident led to a Local Hearing, at which Dingle received a disciplinary charge resulting in the loss of two days accrued leave.[133] This loss cannot be considered a violation of procedural due process because Dingle does not dispute the fairness of the hearing.[134]

■■■ It must be noted that Dingle alleges that "Gadson's treatment ... is ongoing and continuous to the present."[135] Accordingly, in his Affidavit, Dingle alleges that on April 21, 2010,

> Gadson sent a defamatory email to me with a cc to all NYCHA supervisory personnel including Mr. Knapp, Mr. Ginsberg, and Ms. Teri Dawson, stating in a bold large font type that I was "incompetent[t]," "failed to perform my duties," that I needed to "reevaluate my responsibilities as a superintendent" and refused to accept any responsibility for failing to answer my request for funds.[136]

Unlike the allegedly false statements in the Complaint, this email carries the potential to meet the "stigma" standard.[137] Nevertheless, Dingle does not allege any sort of corresponding harm from this email that would satisfy the "plus" requirement. As such, this claim is dismissed with prejudice.[138]

### 3. Defenses to the Section 1983 Claim

#### a. Gadson Is Not Protected by Qualified Immunity

Defendants do not assert that Gadson is entitled to qualified immunity with regard to the First Amendment retaliation claim. They do argue, however, that "[t]he deprivation of liberty interest claim should ... be dismissed as against Gadson, in her individual capacity, on the ground that Gadson is protected by qualified immunity."[139] Because Dingle's deprivation of liberty interest claim has been dismissed with prejudice, this argument is moot.

#### b. The Municipal Liability Against the NYCHA Is Dismissed

Dingle alleges that "Defendants did knowingly, recklessly, or with gross negligence fail to instruct, supervise, control, and discipline on a continuing basis Defendant Gadson in her duties to refrain from unlawfully and maliciously retaliating against Plaintiff for engaging in protected activities."[140] However, Dingle does not sufficiently allege "deliberate indifference" on behalf of the NYCHA.[141] When Dingle complained to his supervisors about Gadson, his complaints were not ignored—supervisors answered Dingle's emails and held meetings in response to his complaints.[142]

■■■ The only alleged instances that demonstrate the NYCHA's indifference

133. *See* Dingle Aff. ¶ 14.

134. *See Martucciello v. Ward*, No. 87 Civ. 1709, 1988 WL 3490, at *4 (S.D.N.Y. Jan. 11, 1988).

135. Compl. ¶ 92.

136. Dingle Aff. ¶ 17.

137. *See O'Neill*, 23 F.3d at 692.

138. There is no additional substantive information Dingle could offer to satisfy the "plus" requirement. Granting him the opportunity

to replead this claim would therefore be futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir.2000).

139. Def. Mem. at 17.

140. Compl. ¶ 100.

141. *Jenkins*, 478 F.3d at 94.

142. *See* Compl. ¶¶ 18, 27, 42.

are when Dingle never heard back regarding a complaint filed with the NYCHA's Inspector General's office on June 30, 2009,[143] and when Knapp refused to meet with Dingle's union representative in August 2009, regarding the conflict between Dingle and Gadson.[144] Dingle additionally alleges that Joseph Porcelli, a Borough Administrator, was aware of Gadson's First Amendment retaliation and did nothing to stop it—"[i]n the context of [a] stream of emails going back and forth by and between Gadson and Porcelli and Mr. Dingle during this time, it was clear to Porcelli that Mr. Dingle was complaining about Gadson's retaliation against him . . . ."[145] But these three examples of inaction do not indicate a "discriminatory practice . . . so manifest as to imply the constructive acquiescence of senior policy-making officials."[146] Dingle's "failure to train or supervise" allegation also fails because Dingle does not allege any "difficult choice" or "situation" that training or supervision would have made less difficult.[147] Because it appears that Dingle has carefully alleged the details of every instance of

alleged indifference, leave to amend would be futile. Accordingly, this claim is dismissed with prejudice.

## B. The State Law Claims Are Dismissed

Defendants argue that Dingle's state law claims—defamation and a whistleblower claim under section 75-b—should be dismissed because Dingle failed to comply with the pleading requirements set forth by section 157.[148] Section 157 applies to Dingle's state law claims against the NYCHA because the statute discusses claims "against an authority."[149] It also applies to Dingle's claims against Gadson, however, because Gadson is an employee of the NYCHA—a public corporation.[150]

Although Dingle eventually filed a Notice of Claim on June 10, 2010,[151] it is beyond cavil that he did not meet the statutory pleading requirements at the time of filing. "The purpose of the notice of claim requirement is to afford the municipality an adequate opportunity to investigate the claim in a timely and efficient manner and, where appropriate, to settle claims without the expense and risks of litigation."[152] By filing a Notice of Claim

143. *See id.* ¶ 68.

144. *See id.* ¶ 79.

145. *Id.* ¶ 39.

146. *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 871 (2d Cir.1992). Dingle does not allege that Knapp is a senior policy-making official, but even if Knapp acts in this capacity, his refusal to meet with a union representative on one occasion cannot be characterized as a "persistent and widespread" discriminatory practice. *Id.* at 870.

147. *Walker,* 974 F.2d at 297.

148. *See* Reply Memorandum of Law of Defendants in Support of Their Motion for Judgment on the Pleadings at 18, 22.

149. N.Y. Pub. Hous. Law § 157.

150. *See* N.Y. Gen. Mun. Law § 50–e(a) ("[A] notice of claim is required by law as a condition precedent to the commencement of an action or special proceeding against a public corporation, as defined in the general construction law, or any officer, appointee or employee thereof. . . ."). It is well settled that the NYCHA is a public corporation. *See Barnes v. New York City Hous. Auth.,* 262 A.D.2d 46, 691 N.Y.S.2d 463, 464 (1st Dep't 1999); *Nachowitz v. New York City Hous. Auth.,* 97 A.D.2d 373, 467 N.Y.S.2d 386, 386 (1st Dep't 1983) ("New York City Housing Authority is a public corporation").

151. Notice of Claim, Ex. A to Opp. Mem., at 3. The actual document is signed and dated "June 10, 2006", but notarized with the date "June 10, 2010". Presumably, the 2006 date is a typographical error.

152. *McLaurin v. New Rochelle Police Officers,* 368 F.Supp.2d 289, 296 (S.D.N.Y.2005) (citing *Brown v. New York City Transit Auth.,* 172 A.D.2d 178, 568 N.Y.S.2d 54, 55 (1st Dep't 1991)).

midway through the pleadings, Dingle did not satisfy these purposes. He therefore failed to comply with New York State's statutory requirements.

Dingle's state claims are dismissed for failure to timely file notice of claim without prejudice. Because this Court cannot grant permission to file a late Notice of Claim,[153] Dingle must pursue his state claims in state court.

## V. CONCLUSION

For the reasons stated above, Defendants' motion for judgment on the pleadings is granted in part and denied in part. The Clerk of the Court is directed to close this motion (Docket No. 15). A conference is scheduled for October 13, 2010, at 4:30 p.m., in Courtroom 15C.

SO ORDERED.

---

153. *See Gibson,* 2006 WL 1234971, at *5.