LIPEZ, Circuit Judge,
concurring.
This case highlights two important facets of the Parratt-Hudson doctrine not yet addressed by the Supreme Court: application of the “random and unauthorized” jurisprudence to a state’s highest ranking official and the availability of qualified immunity to state actors whose disregard of state law provides the basis for a procedural due process claim. Although I agree with my colleagues’ conclusion that the San Gerónimo Caribe Project, Inc. (“SGCP”) has not alleged a viable due process claim against any of the defendants, I do not share their willingness to apply the “random and unauthorized” standard to the alleged conduct of the Governor. The outrageous behavior of the Commonwealth’s chief executive, as alleged, should not be analyzed in the same way as the unauthorized and unpredictable acts of the prison employees whose conduct was at issue in Parratt and Hudson. See Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). I also write separately to express my view that the Supreme Court’s Parratt-Hudson jurisprudence, as elaborated in Zinermon v. Burch, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), cannot sensibly be applied in the qualified immunity context. My hope is that the Court will soon provide much-needed clarification, ending the decades of uncertainty surrounding the Parratt-Hudson doctrine.
I.
I accept and join the majority’s analysis of the claims against the ARPE and the Secretary of Justice. With respect to the Governor, however, it is unnecessary in this case to undertake the usual ParrattHudson inquiry into the defendant’s authority and discretion and, as I shall explain, I believe it is inappropriate to do so. In my view, the claim against the Governor fails because the allegations do not plausibly allege a causal link between the Governor’s order and the harm to SGCP. The complaint baldly asserts that the Governor, through his directive to agency officials to halt construction,[24] “willfully *495 caused subsequent actions by those officials.” Compl. ¶ 30. The complaint, however, does not describe any relationship between the Governor’s pronouncement and subsequent events. Both the Planning Board and the ARPE administrator cited the previously issued Secretary of Justice’s opinion, not the Governor’s order, as the impetus for initiating the proceedings that led to the suspension of SGCP’s project.[25] Thus, in effect, the complaint depicts the Governor’s order as merely an outrageous political statement without any impact on appellant’s property rights.
The Governor’s alleged involvement in the controversy is troubling, however. Some five years after construction on the project had begun, with one part nearing completion and more than $200 million already invested by SGCP, the Governor issued the order to suspend all permits and freeze construction for sixty days. There was no emergency involving public health, safety or welfare. Instead, there was a vocal group of protesters with a significant political constituency. Yet, according to the complaint, the Governor issued an edict that did not contemplate any opportunity for San Gerónimo to defend its permits at a hearing before they were suspended.
The Governor’s unique role as the chief executive of the Commonwealth raises the question of whether a defendant’s high status in the state hierarchy should be a factor in the Parratt-Hudson inquiry. Under the majority’s reasoning, even if the Governor’s directive had, instigated the subsequent events, SGCP would be without a constitutional remedy for the harm caused. Yet, the Supreme Court surely did not have in mind the conduct of a state’s chief executive, acting in his official capacity, when it rejected the claims in Parrott and Hudson to avoid “turning every alleged injury which may have been inflicted by a state official acting under ‘color of law’ into a violation of the Fourteenth Amendment cognizable under § 1983.” Parrott, 451 U.S. at 544, 101 S.Ct. 1908.
The suspension of permits by gubernatorial fiat does not resemble the low-level misconduct at issue in Parrott and Hudson, and allowing a procedural due process claim based on the Governor’s involvement in the permit suspension would not make a federal case out of an ordinary tort. To the contrary, such a claim would be consistent with longstanding precedent holding that § 1983 is available as a remedy for injuries inflicted by the abuse of state power, as well as by state law itself. See Monroe v. Pape, 365 U.S. 167, 175-76, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (explaining that § 1983 was created, in part, as a remedy “against those who representing a State in some capacity were unable or unwilling to enforce a state law”); id. at 183, 81 S.Ct. 473 (“It is no answer that the State has a law which if enforced would give relief.”); see also Zinermon, 494 U.S. at 124, 110 S.Ct. 975 (noting that Monroe “rejected the view that § 1983 applies only to violations of constitutional rights that are authorized by state law, and does not reach abuses of state authority that are forbidden by the State’s statutes or Con *496 stitution or are torts under the State’s common law”); id. at 125, 110 S.Ct. 975 (“[I]n many cases there is ‘no quarrel with the state laws on the books’; instead, the problem is the way those laws are or are not implemented by state officials.” (quoting Monroe, 365 U.S. at 176, 81 S.Ct. 473) (citation omitted)).
Of course, tension among the principles of Monroe, Parratb-Hudson, and Zinermon has long been noted by courts and scholars, traceable to an apparent disagreement within the Court about when the unlawful acts of a state actor should be attributable to the state and thus provide the basis for a finding of a constitutional violation. See, e.g., Bogart v. Chapelt, 396 F.3d 548, 564-65 (4th Cir.2005) (Williams, J., dissenting); Easter House v. Felder, 910 F.2d 1387, 1408-09 (7th Cir.1990) (Easterbrook, J., concurring); Jose R. Juarez, Jr., The Supreme Court as the Cheshire Cat: Escaping the Section 1988 Wonderland, 25 St. Mary’s L.J. 1, 5-7 (1993) (“Cheshire Cat ”); Larry Alexander, Constitutional Torts, the Supreme Court, and the Law of Noncontradiction: An Essay on Zinermon v. Burch, 87 Nw. U.L. Rev. 576, 580-83 (1993) (“Law of Noncontradiction”). Indeed, Judge Easterbrook has observed that the Parratb-Hudson-Zinermon line of cases “resembl[es] the path of a drunken sailor.” Easter House, 910 F.2d at 1409 (Easterbrook, J., concurring); see also id. at 1408 (noting that Parrattr-Hudson and Zinermon “cannot coexist, except perhaps by drawing a distinction between liberty and property, or between important and modest deprivations, neither of which the majority in Zinermon adopted”).
Scholars have identified “two competing visions of § 1983 liability,” labeled the “Governmental” model and the “Legalist” model. Bogart, 396 F.3d at 564 (Williams, J., dissenting). Under the former, reflected in the Court’s decision in Monroe, liability may be imposed under § 1983 “for all constitutional violations committed by governmental actors in the scope of their employment — even if the actor violates state law when committing the violation.” Id. Under the latter, reflected in Parrott and Hudson, section 1983 “imposes liability only if state lawmakers endorse a constitutional violation.” Id.[26]
Allusions to both models appear in the majority opinion in Zinermon, and that inconsistency has left lower courts debating whether the Supreme Court intended a narrow (more Legalist) or broad (more Governmental) reading of the case — and, in turn, a narrow (more Governmental) or broad (more Legalist) reading of the Parratt-Hudson doctrine. See, e.g., Bogart, 396 F.3d at 565 (Williams, J., dissenting); Cheshire Cat, 25 St. Mary’s L.J. at 27-37 (describing confusion in the lower courts); *497 Law of Noncontradiction, 87 Nw. U.L. Rev. at 596 (“It is not an overstatement to describe the Supreme Court’s constitutional torts jurisprudence as a welter of confusion, leaving litigants and lower courts completely at sea.”).[27] Professor Juarez has proposed simplifying the procedural due process inquiry by returning it to preParratt standards, i.e., permitting “[section 1983 procedural due process claims challenging deprivations without predeprivation hearings except when there is a need for quick action or when it is impractical to provide the predeprivation hearing.” Cheshire Cat, 25 St. Mary’s L.J. at 65. He maintains that, with the quick-action and impracticality limitations on § 1983 claims, “there should be no danger of transforming Section 1983 into the ‘font of tort law’ feared by so many courts.” Id.' at 65-66.[28]
Even under a broad construction of the principle espoused in Parratt and Hudson, however, actions undertaken by a governor in his or her official capacity should be attributed to the State. The Supreme Court in Hudson described the inquiry as “whether the state is in a position to provide for predeprivation process.” Hudson, 468 U.S. at 534, 104 S.Ct. 3194 (emphasis added). It is one thing to say that an errant prison guard is an actor whose actions, in certain instances, cannot be the basis for a procedural due process violation because they are not the acts of “the State.” It is another thing to insulate a State from responsibility for the Governor’s conduct.[29] Moreover, low-level employees routinely interact with private individuals on small matters, and it is impossible to implement procedures to prevent some “tort-like” harms from occurring. The higher you go up in the hierarchy, the more formal the interactions with the public will be, and it becomes less plausible to say that the actor’s conduct was distinct from the State’s for the purpose of the due process inquiry. Where the per se “state actor” line in the context of Parratt and Hudson should be drawn is a worthy subject of discussion. There can be no debate, however, about where the Governor stands in rela *498 tion to that line.[30]
As the majority points out, at least two circuits have rejected a defendant’s status as a determinative factor. See Johnson v. La. Dep’t of Agric., 18 F.3d 318, 322 (5th Cir.1994); Easter House, 910 F.2d at 1399-1400 (en banc). The Second Circuit, however, has emphasized the significance of status: “Since the ‘state acts through its high-level officials,’ the decisions of these officials more closely resemble established state procedures than the haphazard acts of individual state actors.... ” Velez v. Levy, 401 F.3d 75, 92 (2d Cir.2005); see also Rivera-Powell v. N.Y. City Bd. of Elections, 470 F.3d 458, 465 (2d Cir.2006). The court in Velez noted that the defendant, the Chancellor of the City School District of New York, had “the duty ... to follow the governing New York statutes and regulations,” and it held that “‘any abuse of that authority that rose to the level of a due process violation cannot be considered “random and unauthorized.” ’ ” 401 F.3d at 92 (quoting DiBlasio v. Novello, 344 F.3d 292, 303 (2d Cir.2003)).
The circuit conflict is unsurprising in light of the inconsistency and confusion in the precedent described above. See Cheshire Cat, 25 St. Mary’s L.J. at 24-25 (“If we are confused today, it is because the Supreme Court itself seems to be confused about what it is doing in these Section 1983 cases.” (footnote omitted)). With respect to the Governor, however, I think it is plainly unacceptable to say that his conduct, albeit improper under Commonwealth law, was “unauthorized” in the Parratt-Hudson sense, regardless of whether one prefers the Legalist or Governmental model. The Governor is the chief of state and, as such, his official acts are always those of “the State.” At a minimum, Monroe must mean that a viable section 1983 procedural due process claim will arise if the Governor sets in motion the denial of procedural protections to an individual entitled to predeprivation process. See Zinermon, 494 U.S. at 138, 110 S.Ct. 975 (“The deprivation here is ‘unauthorized’ only in the sense that it was not an act sanctioned by state law, but, instead, was a ‘deprivation] of constitutional rights ... by an official’s abuse of his position.’ ” (quoting Monroe, 365 U.S. at 172, 81 S.Ct. 473) (alteration in original)).
More than two decades ago in Easter House, Judge Easterbrook observed that the Supreme Court’s inconsistent ParrattHudson jurisprudence had left “judges of the inferior federal courts in a difficult position, because any effort to reconcile and apply the cases will be met with a convincing demonstration ... that there is a fly in the ointment.” 910 F.2d at 1409. His concurrence in Easter House was flanked by just such a debate between majority and dissenting opinions. The debate is ongoing, and there is plainly a need for clarification and guidance from the Supreme Court.
II.
Qualified immunity protects government officials from personal liability for *499 damages arising from violations of constitutional rights that were not “clearly established” when the challenged conduct occurred. Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527, 532 (1st Cir. 2011). The doctrine “ ‘balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.’ ” Glik v. Cunniffe, 655 F.3d 78, 81 (1st Cir.2011) (quoting Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). To decide whether a defendant is entitled to qualified immunity, we must determine, inter alia, the clarity of the law establishing the constitutional right at issue and “whether, given the facts of the particular case, a reasonable defendant would have understood that his conduct violated the plaintiff’s] constitutional rights.” Id. (alteration in original) (internal quotation mark omitted). The key to qualified immunity is “the objective legal reasonableness of an official’s acts.” Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).
As the discussion in Section I demonstrates, a court would be hard-pressed to say that the law surrounding the ParvattHudson doctrine is clearly established. Indeed, the original panel in this case concluded that our own case law contains statements that reasonably could be read to adopt an erroneous interpretation of Parratt and Hudson. We thus held that, even though the defendants had committed a procedural due process violation, they were entitled to qualified immunity. See San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, 650 F.3d 826, 838-39 (1st Cir.), vacated and opinion withdraum, 665 F.3d 350 (1st Cir.2011) (en banc).
I now realize, however, that we reached that conclusion by focusing on the clarity of the wrong law. The qualified immunity inquiry in the context of a procedural due process claim cannot turn on whether it was clear that the circumstances fit the mold of Zinermon rather than ParratC Hudson. The constitutional violation at issue is the denial of predeprivation process, and to assess the reasonableness of the defendant’s conduct, we logically must focus on the clarity of the law concerning the plaintiffs entitlement to a hearing. It has been clearly established for more than a half-century that “a deprivation of life, liberty, or property [ordinarily must] ‘be preceded by notice and opportunity for hearing appropriate to the nature of the case.’ ” Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950)); see also Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (describing the balancing of interests necessary to determine “due process”).
Hence, if we had determined that any of the defendants in this case had violated SGCP’s due process rights by failing to hold a meaningful hearing before suspending their permits, the only basis for qualified immunity should be the defendant’s reasonable uncertainty about whether the circumstances presented an “extraordinary situation[ ]” in which a valid governmental interest justified postponing the hearing until after the challenged action. United States v. James Daniel Good Real Prop., 510 U.S. 43, 53, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993). Uncertainty about the applicability of Parrattr-Hudson is irrelevant to the qualified immunity analysis because the Parratt-Hudson has nothing to do with the rationale for protecting officials from damages liability: to eliminate the *500 risk that, in areas where the law is not clearly established, officials will refrain from independently acting in the public interest for fear of being sued. See Harlow, 457 U.S. at 814, 102 S.Ct. 2727.
Indeed, as SGCP points out, the “peculiarity” of the Parratt-Hudson doctrine is that it does not focus on what a reasonable official should have known or done in light of clearly established law. Rather, the Parratt-Hudson-Zinermon question is whether the official’s alleged misconduct is attributable to the State — and thus remediable as a constitutional violation. When Zinermon is found to apply, and the plaintiff succeeds in showing that clearly established law entitled him to predeprivation process, the defendant state official should not be able to avoid personal liability by raising a qualified immunity defense based on Parratt-Hudson. Granting immunity based on the lack of clarity as to whether the State bears responsibility would turn the qualified immunity doctrine on its head. The official would in effect be seeking immunity based on a “reasonable” belief that his conduct was so wrong — i.e., it was “random and unauthorized” — that it could not provide the basis for a procedural due process claim. Such an immunity would provide an unacceptable “license to lawless conduct.” See Harlow, 457 U.S. at 819, 102 S.Ct. 2727.
It is disturbing enough that bad-acting officials escape liability for a constitutional injury when the Parratt-Hudson doctrine applies and the wrongful denial of predeprivation process is not a due process violation.[31] It would be a greater injustice, and undermine the objective of the qualified immunity doctrine, for a court to find a due process violation but provide no remedy to the plaintiff because the defendant could have thought that the ParrattHudson doctrine would let him (along with the State) off the hook for his violation of clearly established due process law.
In sum, the qualified immunity doctrine in the procedural due process context must be applied consistently with its purpose to shield well-meaning and reasonable public officials from the burden of damages while holding accountable those officials who “exercise power irresponsibly,” Glik, 655 F.3d at 81. The Parratt-Hudson doctrine itself denies a federal remedy to individuals harmed by the random and unauthorized conduct of state actors; the uncertainty surrounding the doctrine’s scope should not be used to further extend the immunity of rogue state officials.
III.
The confusion surrounding the parameters of the Parratt-Hudson doctrine is not merely an academic puzzle. The Constitution demands that we attempt to insure “justice in the individual case.” Laura Oren, Signing into Heaven: Zinermon v. Burch, Federal Rights, and State Remedies Thirty Years After Monroe v. Pape, 40 Emory L.J. 1, 70 (1991). At best, the Parratt-Hudson doctrine has been an unreliable way to advance that objective because of the mixed messages from the *501 Supreme Court concerning its scope. The doctrine’s rote application to high-ranking government officials is particularly troubling, and it creates a stark conflict with long established precedent holding that the State bears responsibility for the abuse of governmental authority by state officials. The conflict and confusion concerning the Parratt-Hudson doctrine should not, however, provide a basis for immunizing government officials who have acted in blatant disregard of the law from personal liability for their wrongdoing. Under standard qualified immunity principles, the only pertinent question when an unconstitutional denial of predeprivation process has occurred is whether the defendant should have known that the Constitution required such predeprivation process.
Additional guidance from the Supreme Court on these issues is both necessary and inevitable. Until such time as that Court speaks, lower courts attempting to provide “justice in the individual case” should be wary of unnecessarily extending its procedural due process precedents beyond their narrowest boundaries.

. The complaint does not quote the Governor directly, but alleges that "the Governor publicly ordered the various agencies that had issued permits for the Project to withdraw or *495 suspend those permits and thereby force a halt to construction.” Compl., at 3. See also id. ¶ 29 (alleging that the Governor "publicly ordered all administrative agencies to suspend all permits for the Paseo Caribe Project and to freeze all construction for an initial period of sixty (60) days”).

. The complaint alleges that "all subsequent actions by governmental agencies suspending permits for the Paseo Caribe Project have been undertaken either at the Secretary's direction or with his knowledge and assistance or that of his subordinates at the Department of Justice.” Compl. ¶ 28.

. Crediting Professors Larry Alexander and Paul Horton for developing the concept, Professor Juarez describes the two models as follows:
The Legalist Model asks whether state laws are constitutionally adequate. If there is an adequate state law, then the plaintiff cannot bring a Section 1983 claim, and must instead rely on state-law claims heard, in most cases, in state court.... The Governmental Model imposes duties on more than state and local lawmakers; it imposes duties on all government officials and agents. Under the Governmental model, it doesn't matter whether the state and local lawmakers have forbidden the infringement of constitutional rights, or have attempted to provide a remedy for such infringements. What matters is whether any state official has infringed the plaintiff's constitutionally protected interests.... [U]nder the Governmental Model, plaintiffs may ... sue under Section 1983 in either state or federal court, even when the state's lawmakers have sought to prevent the violation of constitutional rights.
Cheshire Cat, 25 St. Mary's L.J. at 8, 10 (footnotes omitted).

. Some of the confusion may be attributable to the fact that the issue in Parratt and Hudson was not the denial of a hearing. See Law of Noncontradiction, 87 Nw. U.L. Rev. at 589 ("The bone of contention in both cases was the deprivation, not the process that led up to it.”).

. The Supreme Court first warned against turning the Fourteenth Amendment into "a font of tort law” in Paul v. Davis, 424 U.S. 693, 701, 96 S.Ct 1155, 47 L.Ed.2d 405 (1976), and the phrase has been used frequently since then, including in Parratt. See 451 U.S. at 544, 101 S.Ct. 1908 (quoting Paul). See also, e.g., Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 768, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) (noting the Court's "continuing reluctance to treat the Fourteenth Amendment as ' “a font of tort law,” ’ " and quoting Parratt and Paid)', College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 674, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (noting "our frequent admonition that the Due Process Clause is not merely a 'font of tort law,’ ” and quoting Paul). Our precedent reflects the same sentiment. See Herwins v. City of Revere, 163 F.3d 15, 19 (1st Cir.1998) (noting that, but for the limitation on procedural due process claims where "the state provides an adequate means of redress,” “federal suits might be brought for countless local mistakes by officials in administering the endless array of state laws and local ordinances”).

.The Eleventh Amendment, of course, protects states from damages liability. I refer to the State's "responsibility” only in the sense that identifying a procedural due process violation under the Parratt-Hudson doctrine requires an examination of whether the State could have, and thus should have, prevented the denial of predeprivation process effected by state employees.

. I am not suggesting that only the conduct of policymaking officials should be attributable to the State for purposes of a procedural due process claim. At a minimum, under Zinermon, the State also acts through “any person to whom is delegated the responsibility of giving predeprivation process.” Easter House, 910 F.2d at 1411 (Cudahy, J., dissenting); see also Zineimon, 494 U.S. at 138, 110 S.Ct. 975 (explaining that, where a state "delegate[s] to [defendants] the power and authority to effect the very deprivation complained of ..., and also delegate^] to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful [deprivations],” conduct abusing that authority is not " 'unauthorized' in the sense the term is used in Parratt and Hudson ").

. As we observed in Herwins,
the law might have developed so as to hold the official liable under the Fourteenth Amendment for his own mistake even if the state had done all it could.... But the Supreme Court has ruled that in such cases there is no denial of procedural due process, even by the official, so long as the state provides an adequate means of redress.
163 F.3d at 19. Oddly, this approach seems to give officials an incentive to behave as outrageously as possible in certain circumstances because the further the departure from "clearly established law,” the more likely Parratt-Hudson will apply. Of course, the risk of state remedies would remain.